## LANCASTER et al. v. GULF, C. & S. F. RY. CO.

(District Court, S. D. Texas, at Galveston. April 28, 1924.)

No. 59.

1. **Commerce ⬅89—Court may determine character of railroad extension involved in injunction suit.**

Under Interstate Commerce Act, § 1, pars. 18, 20, 22, as added by Transportation Act, § 402 (Comp. St. Ann. Supp. 1923, § 8563), providing that no interstate carrier shall undertake an extension of its line of railroad without first obtaining from the Interstate Commerce Commission a certificate authorizing it, that any construction in violation of such provision may be enjoined by the courts, and that the authority of the Commission thereunder shall not extend to spur or industrial tracks, it is the province of the court in a suit for an injunction to determine whether the proposed construction is an extension or an industrial track, and that question need not first be determined by the Commission.

2. **Courts ⬅269—Suit to enjoin unlawful construction of extension; venue.**

A suit for an injunction under Transportation Act, § 402 (Comp. St. Ann. Supp. 1923, § 8563), to restrain the unlawful construction of an extension, is not one of a local nature, which must be brought in the district where the proposed track is situated.

3. **Equity ⬅85—Laches not defense in suit of public nature.**

Laches is purely a personal matter, and has no application in a suit of a public or quasi public nature.

4. **Railroads ⬅7—Burden on company to show right to construct track without authority from Commission.**

The controlling part of Transportation Act, § 402, pars. 18–22 (Comp. St. Ann. Supp. 1923, § 8563), is paragraph 18, which prohibits an extension of a railroad line without authority of the Interstate Commerce Commission, based on a finding that public necessity or convenience requires it, and par. 22, providing that the authority of the Commission shall not extend to spur or industrial tracks, is a limitation to be strictly construed, and in a suit to enjoin a construction as in violation of the act the burden should rest on defendant to show that the proposed track is clearly within the exception.

5. **Railroads ⬅7—Proposed construction held not an "industrial track," but an "extension."**

A proposed track to be built from a station on an interstate railroad, 7½ miles long and to cost about $500,000, with long side tracks, though designed solely for the purpose of securing carload shipments from large industrial plants now tributary to another line, *held* not an "industrial track," but an "extension" of the line of road, within the meaning of Transportation Act, § 402, par. 18 (Comp. St. Ann. Supp. 1923, § 8563), requiring a certificate of authority from the Interstate Commerce Commission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Extend—Extension.]

In Equity. Suit by J. L. Lancaster and C. W. Wallace, receivers of the Texas & Pacific Railway Company, against the Gulf, Colorado & Santa Fé Railway Company. Decree for complainants.

George Thompson, of Fort Worth, Tex., and Gresham & Willis, of Dallas, Tex., for complainants.

C. K. Lee, of Fort Worth, Tex., and G. B. Ross and Terry, Cavin & Mills, all of Galveston, Tex., for defendant.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HUTCHESON, District Judge.   This is an application for injunction filed under leave of the court of their appointment by the receivers of the Texas & Pacific Railway Company against the Gulf, Colorado & Santa Fé Railway Company, invoking paragraphs 18, 19, and 21, added to section 1 of the Interstate Commerce Act by section 402 of the Transportation Act of February 28, 1920 (Comp. St. Ann. Supp. 1923, § 8563).   It is alleged that in violation of paragraphs 18 and 22 of said act the defendant, without having first obtained the certificate of the Commission as required therein, has undertaken to construct an extension of its line of railroad in Dallas county.

The defendant denies that it is its purpose to construct an extension of its line of railway, and declares that it is merely constructing an industrial track, which, they say, is not only not an extension of its line of railway, as prohibited in paragraph 18, but is that character of construction which by paragraph 22 is withdrawn from the jurisdiction of the Commission, and as to which no certificate is required.

The matter was referred to a master for hearing and advisory report, and after a full and exhaustive hearing he reported in substance that there was no dispute as to the facts; that the real controversy between the parties arose out of the different constructions put by them upon the terms "extension of line of railroad" and "industrial track" used in the act.

After setting out in a clear, fair, and full way a résumé of the material facts, the master announced the conclusion that the proposed construction constituted, not an industrial track, but an extension of the line, which required a certificate, and recommended that the injunction prayed for issue.   This conclusion of the master, which he supported by an excellently reasoned argument, is excepted to with vigor by the defendant, and in oral argument and in learned and exhaustive briefs the matter has been argued before me.   In addition to the main point as to the "nature of the track," defendant raised before the master the following points, all of which were decided against it:

[1] (1) That complainants have no right to sue, because whether a track construction requires a certificate or not is an administrative question, which must first be determined by the Commission before a suit can be maintained.

Without discussing the matter at length, or reviewing the authorities, I think it clear that the master disposed of this point correctly, because the act expressly withdraws from the jurisdiction of the Commission "industrial tracks" and declares that the courts shall issue an injunction against "extensions of lines" made without certificate at the suit of any interested party.   When an act of Congress limits the jurisdiction of an administrative body, and expressly directs recourse, not to that body, but to the courts, for relief for failure to comply with the act, the court applied to cannot decline to determine whether the relief should be granted on the ground of the necessity for prior administrative construction, because to do so would abrogate the most important function of the court, the construction of statutes, in favor of a body having no jurisdiction whatever to construe, but merely to administer, them.

The cases arising under the rate provisions of the Commerce Act have no application here, as those provisions are confided to the Commission, not for construction as to their meaning, but for administrative application. In such matters, unless the Commission has made an express application, there is no justiciable question arising. In short, the act, as to these features, is not complete until it has been administratively applied, and the judicial construction of it in that kind of case is in reality not a construction of the act of Congress alone, but a construction of that act as applied to the administrative acts of the Commission.

[2] (2) It was also argued before the master that the suit was one of a local nature, and that the venue lay with the District Court of the Northern District of Texas. As I understand it, this point, as is also the point made vainly before the master that the receivers of the Texas & Pacific Railway Company had no authority to sue, is abandoned here; but, whether abandoned or not, I thoroughly agree with the master in his disposition of these matters, and will myself over-rule these two contentions.

[3] Defendant also asserts laches against complainants. The master on this point ruled against it, and in this ruling I concur, not only for the reasons stated by him in his excellent report, that there were no fact conditions that would give rise to such a principle, but because of the conclusive consideration of law that the matter is one of a quasi public nature, as to which the parties at interest, complainants here, represent, not truly themselves, but the public, in whose interest the act was passed, and whose right to punish for, or prevent, the doing of a criminal act is not lost or affected by laches. Laches is purely a personal matter, arising in equity somewhat out of the same considerations as those which are responsible for the maxim "clean hands," the principle of estoppel, etc., and it should have no application to a public suit of this character. Besides, the very structure of the act shows that injunction will lie against the operation of the track, as well as against its construction, so that it is not possible for any person to claim a right against injunction springing out of the delay in questioning the construction of a forbidden track, since operation over the track is forbidden equally with construction.

This brings us to the real difficulty in the case, the "true character of the track" in issue, which difficulty springs out of and is accentuated by the fact that the terms "extension of line of railroad" and "industrial track" have no clear and established restrictive definition, either in dictionaries or in railroad practice, which will permit of the case being settled by rule of thumb, but, on the contrary, these terms have a wide latitude of meaning, according to the context in which they are used. Since Congress has not undertaken to define the words used, and since it is plain that they may be, according to the angle of approach, given wide and varied meaning, it is evident that the purpose of the act must be drawn from its entire structure, and that purpose, together with the context in which the words are used, must at the last be the guide to the interpretation of the words at issue.

I think it must be conceded that, if the paramount, overriding purpose of the act was to bring fully within the control of the Commis-

sion the matter of steam railroad extensions, constructions, etc., in so far as they affect interstate commerce (State of Texas v. Eastern Texas R. R., 258 U. S. 204, 42 Sup. Ct. 281, 66 L. Ed. 566), and paragraph 22 does not give color or character to the act, but is merely in the nature of a proviso or limitation upon the general grant of power, it follows inevitably that the words in paragraph 18, "extension of line," are the words to be construed broadly, and the words in paragraph 22 the words to be construed narrowly. This is the angle of approach of complainants, and from it there is no difficulty in holding a track, such as the one involved in this case is supposed to be, to be an extension line, for as it is described in complainants' brief it is—

"A 'main track' extending into the freight tonnage territory of another carrier seven miles distant from defendant's railroad, and which theretofore has not been served by it; a 'main track' which itself, as appurtenant thereto, has Y-tracks at either terminus (blueprint, Tr. 137), a side track 1,200 feet in length (Tr. 114), one 1,500 feet in length (Tr. 115), and a double side track 3,000 feet in length near the Trinity Portland Cement plant (Tr. 130), with 4,900 feet of storage or terminal tracks at Hale (Tr. 126), and with spur tracks leading to and connecting with tracks owned by each of industries in the territory intended to be reached; a 'main track' that is to have the same ruling grade as defendant's main line, and that will be constructed of 75-pound rails as heavy as some of defendant's branch line main tracks (Tr. 405–406), with a right of way owned in fee and of the usual main line width of 100 feet (Tr. 412), which will be fenced (Tr. 398), a line the construction of which will involve heavy fills and deep cuts, with 700 feet of open trestle (Tr. 127), and which will necessitate an undercrossing of the Dallas-Fort Worth Interurban and of the Dallas-Fort Worth pike, and all for an expenditure of a half million 'dollars, representing a construction cost per mile of more than $71,000; a 'main track' over which there will move a volume of tonnage gauged by an annual revenue of nearly three quarters of a million dollars, representing between 13,000 and 14,000 carloads of freight, or approximately thirty-seven loaded cars a day (Tr. 282), an amount of business that will exceed to the mind of Mr. Hershey (defendant's general freight agent) the tonnage that originates" on any hundred miles of railroad in this state (Tr. 276).

Defendant, on the other hand, seizes on the words in paragraph 22 as indicative of the real purpose of Congress—that is, to keep the hands of the Commission off of extensions which are not clearly shown to be connected with all of the incidents of a complete railroad service —and from this angle they have no difficulty in showing that this line of theirs is merely an industrial track, because its whole purpose is to serve industries. It has no stations, no scheduled service, no passenger nor general freight traffic. This difference in the angle of approach is amply sufficient to account for the controversy between the parties, and the giving by me of full recognition to the effect of this difference in approach has enabled me to reach my conclusion, and to feel that, if my angle of approach is right, my conclusion must be sound.

[4] If, as I believe to be the case, paragraph 18 is the controlling portion of the act, and the purpose there expressed to make the public good, rather than the competitive instinct of railroad companies, the determining factor in the matter of whether substantial capital additions to existing railroads and substantial capital outlay in launching new roads shall be incurred, then in any case of complaint against the

proposed addition to the capital account of a railroad company for the construction or extension of a line of road, which construction or extension is not sanctioned by a certificate of the Commission, an injunction ought to issue unless the constructor can satisfy the court that the construction is clearly within the exception to or limitation upon the statute, and is a side track, spur track, switch track, or industrial track, as contemplated and provided for in paragraph 22 of the act.

[5] Now, what is this case? The master has set it out very fairly and clearly, and I quote the material part of his findings:

"There is no conflicting evidence in this case. The Texas & Pacific Railway Company is an interstate common carrier operating a line of railroad from New Orleans, La., to El Paso, Tex., with 1,952 miles of lines. Its railway line passes through the city of Dallas in a general easterly and westerly direction. The Gulf, Colorado & Santa Fé Railway Company is also an interstate common carrier, operating a line of railroad from Purcell, Okl., to Galveston, Tex., with 1,909 miles of lines, with its principal office in Galveston, Tex., and which operates in a system composed of the Atchison, Topeka & Santa Fé, the Gulf, Colorado & Santa Fé, and the Panhandle & Santa Fé. The Santa Fé Railway runs through the city of Dallas in a general northeasterly and southwesterly direction. The two railroads diverge from a common point in the city of Dallas, the Texas & Pacific running west, north of Oak Cliff, and the Santa Fé running southwest, south of Oak Cliff. Oak Cliff is that part of the city of Dallas lying west of the Trinity river. The line of railroad proposed to be constructed by the Santa Fé will be located entirely in Dallas county, and will handle both intra and inter-state freight.

"The track will begin at Hale, a station on the Santa Fé Railway 1.7 miles southwest of the corporate limits of that part of the city of Dallas called Oak Cliff, and will extend in a northwesterly, northerly, and northeasterly direction, to a tract of land abutting on the south side of the Texas & Pacific Railway occupied by the Wyatt Metal & Boiler Works, a total distance of 7.5 miles. The Wyatt Metal & Boiler Works is located 1¼ miles north of the corporate line of Oak Cliff. This line of railroad will serve, in the order named, the following industries: Trinity Portland Cement Company, located 2¾ miles west of the corporate lines of Oak Cliff; the Oriental Oil Company, located 2½ miles northwest of the corporate line of Oak Cliff; the Texas Company, located 2½ miles northwest of the corporate line of Oak Cliff; the Texas Portland Cement Company, located 1½ miles northwest from the corporate limits of Oak Cliff; the Clayton Oil & Refinery Company, located 1¼ miles north of the corporate limits of Oak Cliff; and the Wyatt Metal & Boiler Works, located 1¼ miles north of the corporate limits of Oak Cliff.

"The location of the track and of these industries with reference to the city of Dallas and Oak Cliff can quickly be ascertained by referring to the map of the Hale Cement line, marked 'Exhibit 1 Merritt,' filed herewith. The Trinity river is the western corporation line of the city of Dallas, at the point of crossing by the Texas & Pacific Railway. These industrial concerns are located along the Texas & Pacific Railway at the following distances from the Trinity river; (1) Wyatt Metal & Boiler Works, 2½ miles; (2) Clayton Oil & Refinery Company, 2½ miles; (3) Texas Portland Cement Company, 3¼ miles; (4) Oriental Oil Company, 4 miles; (5) the Texas Company, 4½ miles; (6) Trinity Portland Cement Company, 5 miles. The district in which these industries are located is generally known and referred to as West Dallas.

"There are three stations located on the Texas & Pacific Railway in this industrial district—the first being Harry's, located near the Texas Portland Cement Company, where there is a pagoda with an agent; Gates, located near the Texas Company, at which there is a little station building and an agent; Eagle Ford, located near the Trinity Portland Cement Company plant, at which there is a depot and agent. Eagle Ford, the farthest station

west, is 5 miles from the Trinity river. The air line distance from Hale to the industrial district affected is about 2¼ miles, but the proposed track, as determined by the topographical characteristics of the surrounding country and the necessities of economical construction, will be 7½ miles long. This length is due to the fact that the track must run in an easterly and westerly direction to connect the industries, and thence south to a connection with the main line of the Santa Fé.

"There are several other industries located on the north side of the Texas & Pacific Railway Company in this district which will not be served by the proposed Santa Fé tracks. It is estimated that the entire industrial district produces about 100 cars of freight per day, and that the six industries to be affected by the proposed track furnish about 80 per cent. of this traffic, or about 2,000 cars per month. The estimated yearly revenue from the affected industries will be $3,200,000, of which the Texas & Pacific Railway will receive approximately $1,100,000, and all other lines $2,100,000. Of this traffic the Santa Fé Railway expects to secure 15 or 20 cars per day, and, in addition to what it is now receiving on interchange freight, additional revenue amounting to $600,000 or $700,000 per annum. This estimate was based on anticipated traffic of 14,000 cars per annum, but records of the Texas & Pacific Railway Company show that the annual traffic will be approximately 24,000 cars. Officials of the Santa Fé testified that the business in this industrial district will exceed that originating on any other 100 miles of railroad in the state.

"Unquestionably the construction of these tracks will cause a material depletion in the revenues of the Texas & Pacific Railway Company, without a corresponding proportionate depreciation in expenses of operation. The proposed tracks will cost approximately $510,000, and will be operated solely for the purpose of securing freight from industrial concerns located along the line in car load lots. The Santa Fé officers testified, and it was not disputed, that no passenger train service will be maintained, no less than car-load freight will be accepted, no mail or express business hauled, and no depots or agents will be located thereon, except a depot and agent may be placed at Hale. The officials of the Santa Fé testified that there will be no telegraph service afforded along the line, but admitted that this could be installed without much delay or unusual cost. The rates applying to and from the station at Hale will apply to all freight destined to or originating on these tracks, and switching service only will be maintained thereon. No provision has yet been made for the execution of bills of lading, but these can either be issued at the office of the company in Dallas, or by representatives sent direct to the offices of the various industries. While it is proposed to maintain only a switching service on these tracks, the general manager of the Santa Fé stated on cross-examination, in answer to a hypothetical question, that, if necessary, in response to the demands of shippers for quick shipments on a large accumulation of cars, he might run a through train from the industrial district on these tracks to a point on the main line of the railroad, but that his plans contemplated that all cars would be assembled on the assembly tracks at Hale, where the through trains could pick them up; that if a sufficient number of cars were offered by the shippers, and they insisted on immediate movement, he might run an engine from Dallas or Cleburne to pick up the train load of cars at the industries and move them by through train movement to their destination.

"The proposed track will have an undercrossing where it intersects the interurban line running from Dallas to Fort Worth, which undercrossing will cost approximately $60,000, and will have an undercrossing on the Dallas-Fort Worth pike costing approximately $16,000, will have numerous fills and cuts, amounting in some cases to 25 feet, will have several trestles from 20 to 100 feet in length, and will have virtually the same ruling grade as the defendant's line from Cleburne to Dallas, which, however, was built by promoters, and is not such a line as the Santa Fé would now build for a main trunk line of railroad. The proposed tracks will consist of a main line track, 7½ miles in length, with connections in the nature of a Y at Hale, two storage, assembling, or side tracks at Hale, two side tracks of 1,200 and

1,500 feet in length in the neighborhood of the industries, and five spur tracks connecting this main line with the tracks located at the various industries. The main line, connecting tracks, storage tracks, sidings, and spurs are shown in color on the map marked 'Exhibit 1—Merritt,' filed herewith. The spurs to be constructed by the Santa Fé Railway will connect with existing tracks now owned by the various industries located at their plants. The steel to be used in constructing these tracks will be secondhand 75-pound rails, which is lighter than that usually used by the Santa Fé Railway on its main line construction, but heavier than that used by it on some of its branch lines. The loading and unloading of the cars will be done by the industries, and, except in the case of Clayton Oil & Refinery Company, on tracks owned by them.

"The territory along these tracks between Hale and the industrial district in West Dallas now produces no freight tonnage, and no industry is located on the proposed tracks, except those in the industrial district above mentioned. Hale is a recognized station on the Santa Fé Railway, and has regularly published tariffs. The construction of these tracks would enable the Santa Fé to expeditiously and economically handle the business consigned to it by the shippers located in the industrial district affected, and would eliminate the division of rates on freight heretofore handled as interline traffic.

"The right of way acquired by the Santa Fé for these tracks varies in width from 75 feet to 175 feet for the main line, averaging about 100 feet in width, and will be fenced on both sides for its full length. The width of the right of way was determined by the necessity of extra land for fills and cuts."

Against this formidable array of facts tending to emphasize the importance, from a traffic and operating and a capital investment standpoint, of this construction, the defendant presents with force and vigor the consideration that nothing matters to this inquiry except the fact, which seems to be admitted, that these tracks are for the present, at least, to be used only for industrial purposes. They say, "By their fruits ye shall know them;" they ask "Do men gather grapes of thorns, or figs of thistles?" and say that a track which is constructed for the sole purpose of, and is devoted only to, the service of industries, is and can only be an industrial track.

We are thus brought back to the beginning of the inquiry, and we conclude, as we began, that, if considering the words with their context, and in the light of the purpose of Congress, the court is authorized to give to them the broadest meaning of which they are susceptible, the defendant is right, for a track which serves only industries is in one sense certainly an industrial track. But this, in my opinion, the court is not authorized to do, for not only does the principle "noscitur a sociis" (see Bear Bros. v. Marx, 63 Tex. 298; Black on Interpretation of Laws, p. 194; Brown v. City of Galveston, 97 Tex. 1, 75 S. W. 488; U. S. v. Chase, 135 U. S. 255, 10 Sup. Ct. 756, 34 L. Ed. 117; Gegiow v. Uhl, 239 U. S. 3, 36 Sup. Ct. 2, 60 L. Ed. 114) require a different construction; not only does the fact that paragraph 22 is in the nature of a proviso (U. S. v. Dickson, 15 Pet. 141, 10 L. Ed. 689); but that sixth sense for the interpretation of statutes, and the application and enforcement of statute law in the courts, which the Supreme Court in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U. S. 107, 31 Sup. Ct. 632, 55 L. Ed. 663, calls the "rule of reason,"

requires the court to refuse to give to the word "industrial" as here used, the broad and comprehensive meaning contended for.

It is my opinion that the affirmative is upon the defendant to prove that the track in this case is an industrial track, in order to defeat complainants' prima facie right to injunction upon the showing made, and that the defendant has wholly failed to sustain that burden. If I should be wrong in this, and the burden is upon the complainants to negative that the track in question is an industrial track, I think upon the undisputed facts they have not failed to sustain that burden; so that in either view the recommendation of the master should be approved, and the injunction prayed for should issue.