PIEDMONT & NORTHERN RAILWAY CO. *v.* IN-
TERSTATE COMMERCE COMMISSION ET AL.

No. 664.   Argued April 22, 25, 1932.—Decided May 16, 1932.

*Mr. W. S. O'B. Robinson, Jr.,* with whom *Mr. H. J. Haynsworth* was on the brief, for petitioner.

*Mr. Nelson Thomas,* with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission, respondent.

302

*Mr. Sidney S. Alderman,* with whom *Messrs. S. R. Prince, F. B. Grier, Carl H. Davis,* and *E. S. Jouett* were on the brief, for the respondents other than the Interstate Commerce Commission.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

In 1910 a charter was granted under the laws of North Carolina for Piedmont Traction Company, as a street railway corporation, authorized to construct street railways in and near Gastonia, with the limited powers of such a company. In the same year the Greenville, Spartanburg and Anderson Railway Company was chartered under the laws of South Carolina, as a street railway corporation, with power to run between fixed termini, Anderson on the south and Spartanburg on the north. A syndicate was then formed which procured a charter for petitioner as a railroad corporation under the law of South Carolina, with full power of eminent domain and author-

ity to operate by electricity or otherwise. The Piedmont Traction Company built certain lines in North Carolina, put them into operation, acquired the street railway system of Charlotte and trackage rights over the street railway system of Gastonia. The Greenville, Spartanburg and Anderson Railway Company acquired a line from Belton to Anderson; built one from Greenwood to Greenville, and afterwards on to Spartanburg; secured trackage rights over the street railway systems in Greenville and Anderson and put all of them into operation in April, 1914. The Traction Company and the Railway Company then conveyed their respective properties to the petitioner.

Until the close of 1926 the petitioner owned and operated two separate and disconnected lines of railway, one in South Carolina extending from Greenwood to Spartanburg, about eighty-nine miles, with a branch from Belton to Anderson of eleven miles, and the other in North Carolina extending from Gastonia to Charlotte, about twenty-three miles, with a branch to Belmont, three miles.

In March, 1927, pursuant to corporate action, it proceeded to construct two extensions, one from Spartanburg, the then northern terminus of the South Carolina line, to Gastonia, the southern terminus of the North Carolina line, a distance of fifty-three miles; the other an extension from Charlotte northward to a new terminus at Winston-Salem, North Carolina, a distance of seventy-five miles. The Interstate Commerce Commission notified the company that appropriate application should be made for a certificate of public convenience and necessity authorizing these extensions and that this might be filed without prejudice to the petitioner's making a claim of exemption as an interurban electric railway under § 1, par. 22, of the Interstate Commerce Act. This course was followed. The Commission overruled the claim of exemption and denied a certificate on the merits. The company brought suit in the United States District Court under the Urgent

Deficiencies Act[1] to set aside and annul that portion of the Commission's order which denied it exemption as an interurban electric railway. A statutory court was convened, and after hearing dismissed the suit on the merits.[2] Upon appeal this court held that the order of the Commission, being negative in substance as well as in form, infringed no right of the petitioner, was beyond the scope of the remedy afforded by the Urgent Deficiencies Act, and therefore the suit should have been dismissed for want of jurisdiction.[3]

Thereafter the board of directors by resolution reaffirmed the intention to build both extensions and authorized the construction of the connecting link between Spartanburg and Gastonia. The Commission, upon being advised that work had actually started, brought the present suit in the District Court for Western South Carolina, alleging that the construction was illegal, since no certificate had been obtained as required by the Transportation Act of 1920, § 402, paragraph (18).[4] It sought an injunction pursuant to the terms of paragraph (20) of the section. Several interstate railroads were permitted to intervene as parties in interest. (See *Western Pacific California R. Co.* v. *Southern Pacific Co.*, 284 U. S. 47.) The petitioner defended upon the grounds that the work had been undertaken within ninety days of the adoption of the Transportation Act and for that reason no certificate for the proposed extensions was required,[5] and that petitioner was within the exception to the Com-

---

[1] U. S. C., Tit. 28, § 47.

[2] 30 F. (2d) 421.

[3] *Piedmont & Northern Ry. Co.* v. *United States*, 280 U. S. 469.

[4] Ch. 91, 41 Stat. 476.

[5] See § 402 (18) of the Transportation Act, 1920, 41 Stat. 477. "After ninety days after this paragraph takes effect no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, &c." The first eight words are omitted in U. S. C., Tit. 49, § 1 (18).

mission's jurisdiction over extensions and new construction, created by paragraph (22) of § 1 of the Act, as an interurban electric railway not operated as a part of a general steam railroad system of transportation. After a hearing on pleadings and proofs the trial court overruled both defenses and entered a decree enjoining the further work of construction until a certificate of convenience and necessity should be obtained. Petitioner appealed to the Circuit Court of Appeals for the Fourth Circuit, and we granted certiorari prior to hearing by that court.[6]

The petitioner has abandoned its first contention and stands only on the claimed exemption.

Section 1 of the Interstate Commerce Act, as amended by § .402 of the Transportation Act[7] provides:

" The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

Paragraphs (18) to (21) authorize the Commission to grant a certificate for extensions of line or constructions of new line, or for the abandonment of lines, forbid such action without such certificate, and give the Commission or any party in interest the right to enjoin action in disregard of their provisions.

In support of the claimed exemption petitioner says its lines are exclusively electric, are not operated as parts of a general steam railroad system of transportation, were constructed, equipped, and are maintained and conducted as interurban electric railways, and that the proposed extensions would be of the same character and operated in

---

[6] U. S. C., Tit. 28, § 347.

[7] U. S. C., Tit. 49, § 1 (22).

306

the same manner. The concession is made that the company is engaged in the general transportation of freight and passengers in interstate commerce, that the proposed extensions would be so operated in connection with the existing lines, and that petitioner is therefore subject to the Interstate Commerce Act as amended by the Transportation Act, 1920, except those portions from the application of which interurban electric railways not operated as a part or parts of a general steam railroad system of transportation are expressly excluded. In summary the argument is that paragraph (22) in unambiguous terms excepts petitioner's road from the effect of paragraphs (18) to (21) of § 1, needing neither construction nor interpretation in its application; but that if there be question regarding this contention, the facts with respect to the railway bring it within the intent of the excepting clause, and, finally, that various governmental agencies have so classified it.

Emphasis is placed upon the aptness of the words used in the paragraph as descriptive of petitioner's railway. Thus it is said the road is " electric "; is " interurban," since it extends between cities; and is " not a part of any system of steam railroads." But this literal application is inconclusive, for it ignores the entire phraseology employed, which is, " street, suburban, or interurban electric railways " . . . The descriptive adjectives show that Congress had in mind a class of carriers differing essentially from those long recognized as the objects of national concern and regulation. A few illustrations will demonstrate the impossibility of the proposed narrow construction. It would hardly be contended that if an interstate steam railroad should electrify its entire system this would place it beyond the reach of paragraphs (18) to (21). Yet the road would become both electric and interurban in the etymological sense of the words, and would

not be operated as a part of a general system of steam railroad transportation. Should a new electric transcontinental system be projected, without question application for a certificate under those paragraphs would be required, though here again by mere verbal interpretation it would be exempt from the necessity.

We must therefore seek further to ascertain the distinguishing features which the legislature had in mind. No difficulty is encountered in defining a street or a suburban electric railway. These are essentially local, are fundamentally passenger carriers, are to an inconsiderable extent engaged in interstate carriage, and transact freight business only incidentally and in a small volume. The record indicates that prior to 1920 such street or suburban railways had grown in many instances so as to link distinct communities, and that in addition so-called interurban lines were constructed from time to time, to serve the convenience of two or more cities. But the characteristics of street or suburban railways persisted in these interurban lines. They also were chiefly devoted to passenger traffic and operated single or series self-propelled cars. Many of them carried package freight, some also transported mail, and still fewer carload freight picked up along the line or received for local delivery from connecting steam railroads. It is clear that the phrase " interurban electric railway " was not, in 1920, commonly used to designate a carrier whose major activity was the transportation of interstate freight in trains of standard freight cars. It cannot be said, therefore, that if a railway is operated by electricity and extends between cities paragraph (22) clearly and unequivocally exempts it from the Commission's jurisdiction.

Petitioner, however, insists that examination of the facts with respect to its road demonstrates that it falls into the exempt class. The salient features to which reference is

made are that the lines connect and tie in with the street railway systems in the cities and towns on the system; that of the main line trackage fifteen miles are operated jointly with street car lines; that the street railways in the cities were acquired so that the interurban tracks might be connected with them for urban terminal and trackage facilities; that the motive power is exclusively electric; that the road is not a part of any steam railway system; that a lower voltage, a lighter overhead construction and power supply, and a smaller substation capacity are employed than those of standard steam railroad electric lines; that the signal system would not be suitable for use on a main line steam railroad; that the locomotives are lighter than the standard engines used by steam railroads which have electrified their systems; and that the passenger cars are motivated by self-contained motor units instead of being drawn by locomotives.

These alleged distinctions lose much of their significance when we consider other facts found by the trial court, without exception or assignment of error. These may be summarized. Only 2.9 miles of the present total trackage, or about 2.25 per cent, is located in city streets. The balance is built and operated on private right-of-way and goes around rather than through the cities. The tracks are standard gauge and of standard railroad construction, were, at the time they were laid, of higher class than those of the Southern Railway Company in the same territory, were intended for handling substantial interchange freight traffic in connection with steam railroads, have the same ruling grades as the latter in the same territory, and are of eighty pound rail. There are 17 electric locomotives, ranging from 55 to 100 tons weight; 287 freight cars are owned, which have no electric equipment, are the same in all respects as steam railroad freight cars, are interchangeable with steam rail-

roads, and are and have been regularly so exchanged. Foreign line freight equipment of every character flows freely over the road. As of December 31, 1929, the total investment in equipment since June, 1914, was $778,194, approximately 85 per cent of which represented expenditures for locomotives and interchangeable freight cars used exclusively in the carriage of freight. The electric locomotives are used only for freight. The freight yards are of standard steam railroad construction and equipment, and one of them is a joint facility with the Seaboard and Georgia & Florida, steam railroads. While the locomotives are lighter than those employed on standard steam railroads, they are adequate for the petitioner's traffic. By doubling, as many as 65 freight cars may be drawn, and trains of 40 and 50 cars are usual. Through and local freight trains are operated in the same manner as on steam railroads.

Methods of business solicitation, membership in traffic organizations, and tariffs published and concurred in, are national in scope. The road has filed seventeen general individual tariffs under I. C. C. serial numbers, is a party as initial carrier to 184 general tariffs, and as participating carrier in 364 tariffs published under powers of attorney given to the steam railroads. These tariffs embrace the entire country and parts of Mexico and Canada. From the beginning freight revenues have been large, while those from passenger traffic have progressively decreased. The freight revenues have increased from $496,772.39 for the year ending June 30, 1914, to $2,317,528.77 for 1929. The total passenger revenues for the year ending June 30, 1914, were $324,045.21, but were only $71,562.72 for 1929. For the latter year the freight revenues were 94.5 per cent and the passenger revenues 2.9 per cent of the total revenue. For 1929, 4.3 per cent of the total freight revenues were from local freight, and 95.7 per cent from inter-

line interchange freight. A comparison of interstate with intrastate freight shows that in 1929, 80.7 per cent was interstate and 19.3 per cent intrastate, the latter including freight interchanged with steam railroad connections but originating and destined to points within the same state. There is more than one loaded car of freight each day on petitioner's line for every passenger carried. The average interchange of carload freight with steam railroads of the territory is approximately 6,000 cars per month.

The petitioner now has a connection at its southern terminus with the Georgia & Florida, a steam railroad. See *Atlantic Coast Line R. Co.* v. *United States,* 284 U. S. 288, 291. If the proposed extensions were built it would have a similar connection at its northern terminus with the Norfolk & Western. Thus it would become a connecting link in a new through route and effective line of connecting carriers which would be strongly competitive with existing trunk lines, leading from Florida and the southeast to the northern gateways reached by the Norfolk & Western. If only the proposed extension to close the gap between Spartanburg, S. C. and Gastonia, N. C. should be built the same result would follow, except that the route from Charlotte to Winston-Salem and the connection there with Norfolk & Western would not be entirely over petitioner's own lines, but over a joint route on the Norfolk Southern to Norwood, and Winston-Salem Southbound to Winston-Salem. Petitioner's own estimate contained in its application to the Commission is that the extensions would gain new business diverted from steam railroads of 82,320 cars a year, including 12,300 cars of bridge traffic carried entirely over its lines as the interior connecting link in joint through routes, resulting in a gain of revenue of $3,890,000 for the first year. The estimated loss of revenue to competing carriers is con-

siderably greater. It thus appears that petitioner's business is pre-eminently interchange interstate freight traffic of national character, in all essential respects conducted as is the business of the steam freight carriers in the territory served. The differences in construction, equipment, operation and handling are incidental merely to the use of electric motive power in lieu of steam. The purely local traffic in freight, passengers, baggage and express, is relatively inconsequential.

In *Texas & P. R. Co.* v. *Gulf, C. & S. F. Ry. Co.*, 270 U. S. 266, 277–278, the court announced the guiding principles to be followed in construing the very paragraph involved in the case at bar. As there indicated, the purpose of the statute to develop and maintain an adequate railway system for the people of the United States requires a broader and more liberal interpretation than that to be drawn from mere dictionary definitions of the words employed by Congress. Accordingly, a track seven miles in length, proposed to be constructed to reach industries in territory not theretofore served by the railroad, and which would take away from a competitor much of the traffic then enjoyed, was held not to be an "industrial track," as that phrase is used in paragraph (22), although by strict construction it was such.

The petitioner's railway is of such importance in interstate commerce and renders a service so predominantly devoted to the handling of interstate freight in connection with steam railroads, is in such relation to connecting steam carriers, and competes with steam trunk lines in such manner, that in view of the declared policy of the act we cannot hold it an "interurban" railway within the exemption of the same paragraph. The Transportation Act was remedial legislation and should therefore be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to

effect the remedy intended. *Spokane & Inland Empire R. Co. v. United States*, 241 U. S. 344. In cases where an appreciation of the facts is requisite to proper classification it is not always easy to draw the line. Instances may be supposed where great difficulty might be experienced in determining whether an electric railway line falls within or without the exception of paragraph (22). But this is not such a case. The facts clearly require a holding that petitioner's railway is not within the true intent and purpose of the exclusion intended by the paragraph.

Only a word need be said with respect to the contention that governmental agencies have heretofore classified the railway as an interurban electric line. It is true that in connection with quite diverse administrative functions the United States Labor Board, the Postmaster General, and the Interstate Commerce Commission have classified petitioner's railway as an interurban electric line in distinction to steam railroads. Neither the administrative nor the statutory classification has, however, been uniform, and in any event is not controlling in this litigation.

Attention is drawn to the fact that the same phraseology is used in other sections of the Interstate Commerce Act. But it is so used with other purposes in view.

We are of opinion that the District Court correctly held that petitioner falls within the terms of paragraphs (18) to (21) of § 1 of the Interstate Commerce Act, and was properly enjoined from proceeding with the construction of the proposed extensions in the absence of a certificate of convenience and necessity. The judgment of the District Court is

*Affirmed*

The CHIEF JUSTICE took no part in the consideration or decision of this case.