### R. E. DUVALL CO., Inc., v. WASHINGTON, B. & A. ELECTRIC R. CO.

#### No. 1826.

District Court, D. Maryland.

June 30, 1932.

Marbury, Gosnell & Williams, of Baltimore, Md., for receiver.

Roscoe C. Rowe, of Annapolis, Md., and Adams & Hargest, of Baltimore, Md., for respondent.

**WILLIAM C. COLEMAN,** District Judge.

The question here presented is as to the extent of the authority of the city of Annapolis over the Washington, Baltimore & Annapolis Electric Railroad Company with respect to the use of certain streets in that city. It is claimed by the city that it has the right to require that company to discontinue such use not later than July 2d next, by reason of the fact that an ordinance, passed June 21, 1907, and an amendatory ordinance passed July 2, 1907, by which the company was given a franchise to use certain of the city streets under certain terms and conditions, for a period of twenty-five years, so provide. Accordingly, the city purporting to act in the best interests of its citizens, and asserting that there is no longer any need for the service rendered by the company, but that, on the contrary, the service has become a menace to the public safety and comfort, on June 21, 1932, expressly repealed the early ordinance, effective June 30, 1932. This later ordinance was the result of protracted negotiations—the details of which are not material to the present controversy—between the city and the company covering a number of years, during which complete agreement was never reached, with respect to the extent and character of the company's operations in the city.

The company, now being in receivership appointed by this court, asserts that it is its duty, under section 380 of chapter 473 of the Acts of 1927 of Maryland (Code Pub. Gen. Laws Md. Supp. 1929, art. 23, § 380), being part of the Public Service Commission Act, not to discontinue the operation of its cars within the city of Annapolis without the consent of the public service commission of Maryland, and accordingly, on petition and order nisi issued pursuant thereto and answer filed by the city, an extensive hearing was had; this court being unwilling either to grant or deny the receiver's request until full opportunity might be afforded both sides to present their reasons for their respective positions.

It appears that since March 31, 1911, the company has owned and operated the railroad formerly belonging to the Washington, Baltimore & Annapolis Electric Railway Company and has been engaged in the transportation of freight, express, mail, and passengers between points in the state of Maryland, and likewise between points in the District of Columbia and states other than the state of Maryland, and points in the state of Maryland, and has therefore been engaged not only in intrastate commerce but interstate commerce, and because of being engaged in interstate commerce is subject to certain provisions of the laws generally known as the Interstate Commerce Laws (49 USCA § 1 et seq.) passed by Congress, and is and has been subject also to the jurisdic-

tion in certain respects of the public service commission of Maryland.

It further appears that a substantial volume of passenger traffic between points on the Eastern Shore and other points in the state of Maryland and the District of Columbia and other states is transported by the use of facilities of the bus lines on the Eastern Shore, also of the Annapolis and Claiborne Ferry, and of the lines of the defendant corporation; that in the year 1931 approximately 55,000 foot passengers using the ferry used the line of this defendant corporation, and it is claimed if service is discontinued on the streets of Annapolis it will work a substantial hardship to those persons, because the distance between the stations of the company at Annapolis and the ferry is over a half mile, and will necessitate the ferry passengers walking the intervening distance with their baggage and packages, or else being put to the expense of hiring cabs and the troublesome necessity of two transfers. The receiver alleges that no serious inconvenience would be suffered by the city of Annapolis or its inhabitants by continuing the passage of the cars of the defendant corporation over the streets of the city of Annapolis, to connect with the ferry mentioned.

The receiver further says that there is doubt in his mind as to exactly what is the date on which the franchise with the city expires, and also whether or not the fact that the defendant is in the hands of a receiver does not make it proper for the receiver, under the direction of this court, to continue the operation of the cars in the streets of Annapolis, notwithstanding the expiration date. And further, he says, that he is advised and that it is his duty, under the law of Maryland, not to abandon or discontinue the operation of cars of the company without the consent of the public service commission first had and obtained.

Prior to 1907, the Annapolis, Washington & Baltimore Railroad Company and its predecessor, the Annapolis and Elk Ridge Railroad Company, acquired certain franchises and other rights in the city of Annapolis; but it was not until 1908 that the property and franchises of the former road were acquired by the Washington, Baltimore & Annapolis Electric Railway Company, to which company the franchise now in question was granted by the city of Annapolis in 1907, and which was the predecessor in title of the present petitioner (now represented by this receiver); the Washington, Baltimore & Annapolis Electric Railway Company having been purchased in 1911 by the petitioning company as the result of receivership and foreclosure sale.

Also it appears that as early as 1899, the Potomac & Severn Electric Railway Company, the predecessor of the Washington, Baltimore & Annapolis Railway Company, acquired certain franchise rights in the city of Annapolis, but these were surrendered in return for a franchise granted the latter company in 1902, which franchise is distinct in character and extent from the one now in issue.

 Thus, in so far as other ordinances are concerned, we need not look back of the ordinance of 1907 to determine what is its effect, nor does there appear to be any pertinent prior, special law. So we turn to a consideration of whether the effect of the ordinance of 1907 contended for by the city is qualified by any prior or subsequent general laws.

As to prior laws, our problem is greatly simplified by the fact that the Maryland Court of Appeals, in the case of Jeffers v. Annapolis, 107 Md. 268, 68 A. 553. was called upon to consider this very ordinance now in issue, and upheld its validity. The court said that apart from what authority may have been given the city to pass the ordinance by special act, ample authority for so doing must be found in the general laws, then section 255 of article 23 (now article 23, § 208), which provides that it shall be competent for municipalities and railroad companies to agree upon the terms and conditions upon which the former's streets may be used or occupied by the latter, and that if they could not agree, then the companies may proceed by condemnation to accomplish their purpose. While it is true this decision does not deal with the question of terminating the franchise, nevertheless it does squarely and unequivocally uphold the right of the city of Annapolis to determine by such an ordinance how its streets may be used or occupied by common carriers. The court said in the course of that opinion (page 276 of 107 Md., 68 A. 553, 556): "The ordinances in question therefore, when duly passed by the authorities of the city of Annapolis, and duly accepted by said railway company, as shown by the record, constituted the best evidence obtainable of the agreement provided for by section 255 of article 23, and of the terms and conditions upon which the streets of the city of Annapolis were to be used by said railway."

Since this be true, it seems to be equally true that such power necessarily implies the power to determine how long a franchise may last. The receiver says not, because of the provision in section 380 of article 23 of the Code that permission and approval of the public service commission is first required before a carrier subject to the act may abandon in whole or in part the exercise of any franchise. I do not find merit in this contention. The Public Service Commission Act and all of its provisions were enacted subsequent to the ordinance now before us. We are thus asked to give to it a retroactive character, which would by necessary implication overthrow the autonomy which the Maryland Court of Appeals in the Jeffers Case says the city possesses with respect to such ordinances. There are no precedents for so doing on such a state of facts. We admit that both the express and implied powers of the public service commission are very broad with respect to qualifying rights subsequently acquired, or even with respect to some rights the creation of which antedates the creation of the commission; as, for example, rate making, in cases where no contract obligations would be impaired. However, in the present case we are asked to go much further and, in fact, to require the city of Annapolis to relinquish its police power over common carriers using and occupying its streets, a power which it exercised with the sanction of the Legislature and the confirmation of the highest court of this state, at a time when there was no intervening regulatory body in existence. But, in addition, the requirement of the public service commission just referred to is, I think, intended to relate to mere voluntary action on the part of the carrier, not to abandonment required by contract or by operation of law.

The company is not without adequate means still to assert its claim that its through traffic should not be interrupted. It has the remedy by condemnation, the express alternative means provided by the statute in the event a municipality withholds consent. We see no valid distinction between consent withheld by a municipality and refusal to renew after the expiration of a predetermined period.

There remains to be considered whether, as suggested, the power of the city may be limited by the provision in the Interstate Commerce Act as amended by the Transportation Act, similar to the provision of the Maryland public service commission law which we have just considered, forbidding the abandonment of lines by any carrier subject to the act without first obtaining from the Interstate Commerce Commission a certificate so to do (49 USCA § 1 (18–20).

I find that the above-mentioned provision of the federal statute is inapplicable for two reasons: First, because the petitioning company is an interurban electric railway, not operating as a part or parts of a general steam railroad system of transportation, as that term in the Transportation Act is usually understood and construed by the courts; and, second, because just as under the similar provision of the Maryland law, what is contemplated I think is voluntary abandonment on the part of the carrier, not abandonment by virtue of a contractual obligation or by operation of law.

The recent decision of the Supreme Court in Piedmont & Northern Railroad Company v. Interstate Commerce Commission, 286 U. S. 299, 52 S. Ct. 541, 545, 76 L. Ed. 1115, is clearly distinguishable on the facts. There, unlike the business of the Washington, Baltimore & Annapolis Electric Railroad Company, the petitioner's business was "pre-eminently interchange, interstate freight traffic of national character, in all essential respects conducted as is the business of the steam freight carriers in the territory served."

Lastly, there is some difficulty in determining the exact date when the city of Annapolis may require the petitioning company to cease operation of its lines in the city streets. The ordinance of June 21, 1907, expressly provides that the life of the franchise so to do shall be for a term of twenty-five years from the date of the passage and approval of the ordinance, which was both passed and approved on June 21st. But the city is given an option to purchase the tracks, etc., of the company after twenty-five years from January 1, 1908; that is, after January 1, 1933. Furthermore, the ordinance was amended in very material features by an amendatory ordinance passed on July 2, 1907, which latter expressly provided that it should itself take effect from the date of its passage. So that, as the city contends in its answer, July 2d next would be the correct expiration date. But it would seem inequitable to the court to require the company to abandon its service precisely on that date because, in spite of the contention of the city that there has never been on its part any lack of proper announcement to the company with respect to what it intend-

ed to do, the fact remains that it did confer with the receiver for the company as late as the middle of the present month (June), regarding the question of extension of its franchise, and further saw fit on June 13th to confirm its position not to extend the franchise, by passing repealing ordinances in which the effective date of repeal is fixed as June 30th. This action was such as to cause uncertainty in the mind of the receiver of the company as to exactly when, if at all, he would be required to abandon the company's lines in the city. That is to say, we are faced with so many conflicting dates that the court feels the receiver was well justified in saying that he did not know just what he was required to do. Therefore, I believe that the receiver, although possessing no greater rights respecting the franchise than the company itself would possess, if not in receivership, is entitled to be given, in the public interest and in the interest of the creditors and the owners of the property for whom he is custodian, some additional time.

In addition to what has just been said, the provision of section 11 of the ordinance of 1907 would seem to be persuasive of the same conclusion. There the company is given until January 1, 1908, to complete construction of its tracks, etc. We have seen that the city cannot exercise, upon abandonment, the option to purchase the lines until twenty-five years after the same date; that is, until after January 1, 1933. It would seem therefore that this latter date may, in fact, have been intended as fixing the time limit. Otherwise we would have a harsh, one-sided situation, one which I am reluctant to say the parties actually intended, or the city actually intended, in the absence of clear proof, namely, the company would be required to discontinue the service and yet let the tracks remain for a period of six months under prohibition against either their use or removal. On the other hand, it may have been contemplated that six months were needed in order to perfect negotiations and to enable the city to determine whether or not it would purchase the tracks, etc., of the company.

But, however that may be, the court has reached the conclusion that, in view of the real ambiguity in the ordinance and all of the circumstances and conditions surrounding this controversy, the railroad is entitled to an extension of time. Therefore, in conclusion and summarizing, the court finds that the city of Annapolis is correct in its assertion that it has the power to terminate the franchise, but the court will grant a period of sixty days from July 2d as an extension within which the company can comply with the requirements to cease its operation of cars on the streets of the city of Annapolis.