INTERSTATE COMMERCE COMMISSION
v. A. W. STICKLE & CO.

No. 368—Civil.

District Court, E. D. Oklahoma.

Sept. 12, 1941.

Cleon A. Summers, U. S. Atty., of Muskogee, Okl., Jack Garrett Scott and Hallan Huffman, both of Washington, D. C., and Louis I. Dailey, of Little Rock, Ark., for plaintiff.

J. B. Dudley and Duke Duvall, both of Oklahoma City, Okl., for defendant.

RICE, District Judge.

The plaintiff, Interstate Commerce Commission, (hereinafter referred to as Commission), alleges that the defendant, A. W. Stickle & Company, a corporation (hereinafter referred to as Company), is engaged in the transportation of lumber in interstate commerce for compensation without having complied with the requirements of what is commonly known as the Motor Carrier Act 1935, 49 U.S.C.A. §§ 301–327 (hereinafter referred to as the Act). The Company contends that it is engaged primarily in the wholesale lumber business with its principal office at Oklahoma City, buying lumber at wholesale from various mills situated principally in Arkansas and delivering to retail dealers in the State of Oklahoma and other states. The Company admits the transportation of lumber in interstate commerce and admits that it has no certificate of convenience and necessity or permit and has not otherwise complied with the requirements of the Mo-

tor Carrier Act, its contention being that the transportation of lumber is merely an incident of its primary business of whole-sale dealer in lumber, and that it is a pri-vate carrier within the meaning of the Act.

The Company is an Oklahoma cor-poration with its principal place of busi-ness in Oklahoma City within the West-ern District of the State of Oklahoma. At the beginning of this suit the Company questioned the jurisdiction of this court over the person for the reason that the summons issued herein was served within and by the Marshal of the Western District of Oklahoma. The Company admitted that in its business activities and in delivering lumber to its customers, it frequently passed through the Eastern District of Oklahoma. This court determined that the suit was properly brought within this District and that it has jurisdiction. See 36 F.Supp. 782.

Briefly the Company operates about as follows: It has an office and a place of business in Oklahoma City with some stor-age space for lumber. The two principal owners of the Company prior to its or-ganization were engaged in the lumber business on a commission basis. After the formation of the Company, it was found that in order to meet competition in the sale of lumber to the retail trade in its territory it was necessary to use its own trucks in the delivery of this lumber. The Company buys most of its lumber from mills situated in the Western part of Ar-kansas. Many of its customers are in the State of Oklahoma. By printed circulars distributed among its customers, the re-tail lumber dealers in its territory, the Company solicited business upon the basis of a certain sum per M board feet f. o. b. the mill plus a designated charge for haul-ing the lumber in truck load lots to certain towns, naming thirty six towns in the State of Oklahoma with the rate for hauling to each particular town, advising that the material would be delivered in the com-pany's trucks. The Company solicits busi-ness generally from the retail lumber deal-ers in its territory and agrees to deliver any lumber purchased by any customer. Upon the delivery of lumber, the hauling charge was collected by the man in charge of the truck. Personal solicitations and solicitations by telephone were made by the Company. Much of the business was transacted in this manner. It seemed that the printed circular was merely the basis

of the negotiations. Upon solicitation of business the Company would quote a cer-tain price per M board feet to its cus-tomers. After an agreement upon this price was reached, there would be added the sum designated upon its printed cir-cular for the hauling of the lumber, which total sum represented the cost to the re-tail dealer. After receiving this order from the retail dealer the Company would then contact some one of the mills with which it did business and purchase the required lumber as cheaply as possible, usually for a sum netting the Company approximately a 5% commission. This amount varied, as the Vice President of the Company stat-ed in his testimony, from nothing to 10%. The Company did not deliver any lumber except that which it had purchased for re-sale. In its business the Company operates ten trucks with trailers and delivers from 450,000 to 850,000 board feet of lumber per month. Practically none of the lumber purchased by the Company was stored in its place of business in Oklahoma City. The Company sold very little lumber which it did not deliver in its own trucks. There were instances when the Company made no commission or profit upon the purchase and sale of the lumber, this be-ing due to market and competitive condi-tions. The Vice President of the Com-pany claimed that no profit was made out of the transportation of its lumber, but that its profit was made out of the commis-sion received in the sale of the lumber.

The Commission introduced in evidence the published tariffs of those motor car-riers who had complied with the Act, op-erating within the same territory as the Company, and a comparison of their pub-lished rates with the rates charged by the Company in the transportation of lumber shows that for the same haul the Com-pany receives from $1 to $2 less per M board feet. Using common knowledge as to the price of lumber, it is discovered that the Company is making from $1 to $2 per M board feet as a commission in the sale of its lumber, the result being that the Company is receiving in commis-sion and hauling charges approximately what the licensed motor carriers are re-ceiving for transportation alone. It is the contention of the Commission that the Company is either a contract or a com-mon carrier within the meaning of those terms as used in the Act. It is the con-tention of the Company that it is engaged

in the primary business of wholesaler of lumber, a commercial enterprise of which its transportation services are an incident; that it is a private carrier of property by motor vehicle as defined in the Act.

The terms "common carrier by motor vehicle", "contract carrier by motor vehicle" and "private carrier of property by motor vehicle" are defined in the Act, section 303(a), as follows:

"(14) The term 'common carrier by motor vehicle' means any person who or which undertakes, whether directly or by a lease or any other arrangement, to transport passengers or property, or any class or classes of property, for the general public in interstate or foreign commerce by motor vehicle for compensation, whether over regular or irregular routes, including such motor vehicle operations of carriers by rail or water, and of express or forwarding companies, except to the extent that these operations are subject to the provisions of chapter 1 of this title.

"(15) The term 'contract carrier by motor vehicle' means any person, not included under paragraph (14) of this section, who or which, under special and individual contracts or agreements, and whether directly or by a lease or any other arrangement, transports passengers or property in interstate or foreign commerce by motor vehicle for compensation.

"(16) The term 'motor carrier' includes both a common carrier by motor vehicle and a contract carrier by motor vehicle.

"(17) The term 'private carrier of property by motor vehicle' means any person *not included in the terms 'common carrier by motor vehicle' or 'contract carrier by motor vehicle'* [emphasis supplied], who or which transports in interstate or foreign commerce by motor vehicle property of which such person is the owner, lessee, or bailee, when such transportation is for the purpose of sale, lease, rent, or bailment, or in furtherance of any commercial enterprise."

A common carrier by motor vehicle is required to have a certificate of public convenience and necessity, 49 U.S.C.A. § 306, and is required to file with and publish tariffs approved by the Commission, 49 U.S.C.A. § 318(a). A contract carrier by motor vehicle is required to have a permit from the Commission authorizing it to engage in such business, 49 U.S.C.A. § 309 (a), and must file with the Commission a

schedule of minimum charges for the services performed, 49 U.S.C.A. § 317(a). These and other regulating provisions apply to common and contract carriers but do not apply to a private carrier.

■ The definition of private carrier excludes common and contract carriers. A private carrier is characterized by the fact that he transports property of which he is the "owner, lessee, or bailee" for the purpose of "sale, lease, rent, or bailment, or in furtherance of any commercial enterprise." Common and contract carriers are characterized by the fact that they transport property "for compensation." The problem in this case is to ascertain the true nature of the transportation in the light of the evidence, admissions and agreements.

■ In making the application of these facts herein to the three types of carriers and in determining the true nature of the transportation, it is necessary to have in mind the purpose of the Act as defined in section 302(a): "It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the public interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this chapter." In addition the court should have in mind the fact that this legislation is remedial and should be liberally interpreted to effect its evident purpose and that exemptions from the operation of the Act should be limited to effect the remedy intended. Piedmont & Northern Railway Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115. Use may also be made of decisions of the Interstate Commerce Commission as applied

to analogous factual situations. These decisions, while not binding on the court, in the absence of decisions by the courts are persuasive and entitled to great weight.

Fact situations similar in most essential respects to those shown by the evidence in this case were before the Commission in the following reported decisions on pending applications: Carl W. Moeller Common Carrier Application, 6 M.C.C. 719, MC–86017, Ernest L. Johnson Common Carrier Application, 10 M.C.C. 4, MC–86154, Donald E. Georgia Common Carrier Application, 3 M.C.C. 601, MC–50269, Louis J. Marini Common Carrier Application, 2 M.C.C. 727, MC–50430, Clarence C. Monninger Common Carrier Application, 2 M.C.C. 501, MC–50500, Triangle Motor Company Contract Carrier Application, 2 M.C.C. 485, MC–50804, T. J. McBroom Contract Carrier Application, 1 M.C.C. 425, MC–29370, Clifford Graver Contract Carrier Application, 21 M.C.C. 11, MC–95702, E. V. Forister Common Carrier Application, 10 M.C.C. 461, MC–45912, Theodore Schulz, Jr. Common Carrier Application, 10 M.C.C. 453, MC–1167. In each instance the Commission determined that the applicant was engaged in the transportation of property for compensation as a common carrier. Several of the cases involved transportation of coal purchased at the mine by the carrier and delivered and sold to the customer for cost plus transportation. In one case the Commission used this language: "The shipments are solicited by applicant from anyone who will purchase the coal from him. It is clear that in these operations applicant merely acts in the capacity of an intermediary, and that essentially he undertakes through special arrangements to transport coal for the general public and therefore comes within the statutory definition of a common carrier," Forister Common Carrier Application, supra. In another case the following language was used: "Such operations have been found not to be private carriage but essentially transportation for hire subject to regulation under the Motor Carrier Act, 1935." Application of Clifford Graver, supra.

In the instant case the Company solicits business from retail lumber dealers generally in its territory. It agrees to deliver to any customer the lumber purchased for which it charges and receives compensation for the transportation. These essential facts appear throughout its operations both prior to and at the time of trial. It would appear that this defendant Company essentially undertakes through special arrangements to transport lumber for the general public (meaning retail lumber dealers) and therefore comes within the statutory definition of a common carrier.

Is the transportation in this case an incident to a commercial enterprise, to-wit: wholesale of lumber? If the Company in its activities is a common carrier transporting lumber for hire, the answer must be "no", for the definition of a private carrier may never be construed so as to include a common carrier. The same activities do not fall into both classifications. No definite rule may be made whereby it may be determined with accuracy when transportation is incidental to or in furtherance of some primary commercial enterprise. Each decision must be bottomed on its own facts.

■ It would not seem, however, that transportation may be termed incidental to a primary business when the business claimed to be primary depends solely upon the operation of a fleet of trucks over a wide territory, when definite charges are made for the transportation, which charges vary according to the distance. The buying and selling of lumber in this case appears to be the means or device whereby the Company engages in a rather extensive transportation business. True the Company makes a margin of profit in the buying and selling of lumber, but this profit is consumed in the failure to make a profit in the transportation. The total amount received by the Company from its commission and from its hauling charge approximates what duly licensed common or contract carriers in the same territory realize from transportation alone. The principal payroll of the Company is in connection with its transportation business. Its principal capital investment is in the transportation facilities. The principal service it renders the retail dealer is in transporting the lumber from the mill. The definitions of the three types of carriers must be read and considered together when classifying a carrier under a given state of facts. It must be assumed that Congress in defining a private carrier did not attempt thereby to afford a means or device whereby one might evade the provisions applicable to common or contract carriers. Yet approval of the Company's activities in this case as being those of a

private carrier would afford an opportunity for many persons operating as common carriers or contract carriers to evade such a classification by the simple expedient of becoming commission merchants and acting as intermediaries between the wholesaler and his retail trade. It is the effect of the plan, of what is actually being done, rather than the designation of it by the person concerned or his good faith in endeavoring to engage in the transportation business as a private carrier, that is to govern if the beneficial results intended by the Act are to be attained.

The court is of the opinion that the Company is a common carrier by motor vehicle for compensation as defined in the Act, and is, therefore, subject to regulation as such. Since it is admitted that the Company has not complied with the Act as it applies to a common or a contract carrier, and it is further admitted that it intends to continue its activities unless restrained, the injunction should issue as prayed for in the plaintiff's complaint.