**STATE OF ILLINOIS, Illinois Commerce Commission, and North Shore Commuters Association, Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, and Chicago, North Shore & Milwaukee Railway, Defendants.**

**Civ. No. 62–C–1156.**

United States District Court
N. D. Illinois, E. D.

Dec. 10, 1962.

William G. Clark, Atty. Gen., E. V. Hanrahan, Chicago, Ill., for State of Illinois and Illinois Commerce Commission.

Tenny, Sherman, Bentley & Guthrie, Chicago, Ill., for North Shore Commuters Ass'n.

James P. O'Brien, U. S. Atty., Chicago, Ill., for the United States.

James J. Magner, Chicago, Ill., L. Agnew Myers, Jr., Washington, D. C., Frederick E. Stout, Chicago, Ill., for Chicago, North Shore and Milwaukee Ry.

Robert W. Ginnane and Stanton P. Sender, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Before SWYGERT, Circuit Judge, and MINER and PARSONS, District Judges.

PER CURIAM.

The Interstate Commerce Commission has granted the Chicago, North Shore & Milwaukee Railway a certificate of public convenience and necessity permitting abandonment of its entire line of

railroad extending between Milwaukee, Wisconsin, and Chicago, Illinois.[1]

The State of Illinois, Illinois Commerce Commission, and North Shore Commuters Association, plaintiffs in this proceeding, have instituted this action to set aside and enjoin the Interstate Commerce Commission's order permitting abandonment.

On June 25, 1958, the North Shore applied to the Interstate Commerce Commission under Section 1(18–20) of the Interstate Commerce Act, 49 U.S.C. § 1 (18–20), for a certificate of public convenience and necessity permitting abandonment. Motions to dismiss were filed challenging the jurisdiction of the Commission on the ground that the North Shore is exempt from Commission regulation under Section 1(22), 49 U.S.C. § 1(22), as an electric interurban railroad.

On May 4, 1960, the Interim Report of the Commission, 312 I.C.C. 99, was issued. The Commission determined that the motions to dismiss should be overruled because the North Shore is not a street, suburban, or interurban electric railway within the meaning of Section 1(22). The Commission, however, deferred action on the application for a period of one year to afford the North Shore, in cooperation with the regulatory commissions, the state and local authorities, and the public, an opportunity to explore all possibilities for profitable operation, including an immediate request by the North Shore for a necessary fare increase.

On May 10, 1962, the Report of the Commission After Further Hearing, 317 I.C.C. 191, was issued. The Commission concluded and found as follows:

"We conclude and find that the present revenues have not been, and future revenues will not be, sufficient to cover the cost of applicant's continued operation with sufficient maintenance of facilities necessary to safety of operation; that aban-

donment of all operations is warranted, subject to the condition that applicant shall sell the entire line, or any portion thereof, to any responsible person, firm or corporation offering, prior to the effective date of the certificate and order permitting abandonment, to purchase the same for continued operation (upon approval of this Commission) at a price not less than the net salvage value of the property sought to be acquired; that the imposition of conditions for the protection of employees adversely affected by the abandonment is not justified in the circumstances of this case; and that the inconvenience to users of applicant's service which will result from the abandonment will be mitigated by the availability of rail service provided by the Chicago & North Western Railway and the Chicago, Milwaukee, St. Paul and Pacific Railroad."

Subject to the condition mentioned, the Commission found that the present and future public convenience and necessity permit abandonment by the North Shore of its entire line of railroad, and issued an appropriate certificate and order to be effective 35 days from date of service. This effective date was subsequently extended pending disposition of various petitions for reconsideration.

On October 15, 1962, the Report of the Commission on Reconsideration, was issued. In that report, the Commission again considered and rejected the argument that the North Shore was an exempt interurban electric railway within the meaning of Section 1(22). The Commission also considered and rejected plaintiffs' argument that, even if the North Shore is subject to Commission jurisdiction, the Commission can only authorize abandonment as to interstate commerce.

In this proceeding plaintiffs challenge the action of the Interstate Commerce

1. Chicago, North Shore & Milwaukee Railway Abandonment of Entire Operation, Finance Docket No. 20245, 312 I.C.C. 99;

317 I.C.C. 191, Report on Reconsideration, October 15, 1962 (not printed).

Commission in exercising federal authority by granting this abandonment certificate. They assert that the Commission has exceeded its jurisdiction. Primacy of state control is urged on the ground that the North Shore is an interurban electric railroad exempted by Congress from national regulation. As an alternative, if the North Shore is found not to fall within this exemption, plaintiffs urge that federal authority is limited to abandonment of the North Shore's interstate operations.

It is apparent from the briefs and oral arguments of the opposing parties that this Court must resolve two jurisdictional questions. First, does the North Shore fall within the exemption of Section 1(22) of the Interstate Commerce Act, as being a "street, suburban, or interurban electric railway(s), * * not operated as a part or parts of a general steam railroad system of transportation?" Second, assuming a negative answer to the first question, has Congress granted, and does the Interstate Commerce Commission have, authority to grant a certificate to the North Shore to abandon its entire operations in both intrastate and interstate commerce? We must dispose of these jurisdictional questions before considering the sufficiency of the evidence upon which the Commission granted a certificate of public convenience and necessity permitting abandonment.

For the reasons hereinafter set forth we hold that the North Shore is not within the exemption of Section 1(22) and that the authority of the Commission extends to all phases of operation—both intrastate and interstate—of the North Shore.

Plaintiffs claim that the character of the North Shore as being within the exception of Section 1(22) has been conclusively determined by the United States Supreme Court and therefore the Commission lacked authority to confer on it a status inconsistent with the Supreme Court's ruling.

The Supreme Court in United States v. Chicago, North Shore and Milwaukee Railroad, 288 U.S. 1, 53 S.Ct. 245, 77 L. Ed. 583 (1933), held that the North Shore fell within the exemption of Section 20a of the Interstate Commerce Act. Section 20a contains wording which is identical to that of Section 1(22). In examining the activities of the North Shore, the Court concluded:

"We thus have a typical example of an interurban electric line for passenger service, which has developed, in addition, such freight traffic as could advantageously be undertaken without interfering with performance of the main purpose of the carrier. The facts differentiate the present case from Piedmont & Northern Ry. Co. v. Interstate Commerce Commn., 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115 * * *. There the railway was predominantly a carrier of interchange carload freight * * *. The purely local traffic in freight, passengers, baggage and express was there relatively inconsequential; but here greatly preponderates."

The Supreme Court was asked to conclude that the North Shore railroad had issued securities over a period of ten years in violation of Section 20, whereas such a conclusion might have rendered these securities of no value. Throughout the period in which they were issued the Commission had never challenged the right or authority of the North Shore to issue these securities. That the Court's decision was influenced by an estoppel rationale based on the Railroad's reliance on past administrative rulings is evident:

"With this knowledge of the situation the Commission never, until it requested the Attorney General to institute the present suit, by word or act intimated that the procedure followed by the railroad was illegal or the state regulatory bodies without jurisdiction. It would be difficult indeed to conceive a clearer case of uniform administrative construction of § 20a as applied to this com--

pany. *Conceding that the proper classification of the railway is not free from difficulty,* all doubt is removed by the application of the rule that settled administrative construction is entitled to great weight and should not be overturned except for cogent reasons. * * *

"The primary responsibility rested upon the Commission to determine whether under the circumstances the railroad was required to procure leave under § 20a for the issuance of securities. Evidently entertaining serious doubts on this question it has for more than a decade resolved them in favor of the carrier, and the company and its officers have acted in reliance on the administrative tribunal's construction of the statute. At this late day the courts ought not to uphold an application of the law contradictory of this settled administrative interpretation." (Emphasis supplied.)

In 1941, the Court of Appeals for the Seventh Circuit in Sprague v. Woll, 122 F.2d 128, cert. denied, 314 U.S. 669, 62 S.Ct. 131, 86 L.Ed. 535, interpreted a provision of the Railway Labor Act so as to conclude that the North Shore did not fall within the exemption of 45 U.S.C. § 151. The wording of that particular statute, although similar to the exception of Section 1(22) of the Interstate Commerce Act, specifically excludes from the exception "any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power." The Court, however, agreed with the Commission that the North Shore was both "not a street, interurban or suburban electric railway within the meaning of the exemption provisos" (in the three statutes being considered by the Commission) "*and* that it was a part of the general steam-railroad system of transportation." (at 130.)

In discussing the effect of the North Shore case, supra, the Court of Appeals distinguished the facts and concluded that the motivating reason for that decision was the reliance or estoppel considerations. It further stated at page 131:

"Under all the circumstances we are of the opinion that the holding of the Court did not bind the Commission as to subsequent determinations, and that the duty imposed upon the Commission by the Acts here involved was to be discharged in a proceeding de novo, and in accordance with all the evidence to be adduced in such proceeding."

In 1942, the Court of Appeals for the Seventh Circuit in In re Chicago, North Shore and Milwaukee Railroad Company, 131 F.2d 458, was asked to interpret a section of the Bankruptcy Act in its application to the North Shore railroad. Section 77 of that Act applies to "[A]ny common carrier * * * except a street, a suburban, or interurban electric railway which is not operated as *a* part of a general railroad system of transportation or *which does not derive more than 50 per centum of its operating revenues from the transportation of freight in standard steam railroad freight equipment.*" (Emphasis supplied.) The court concluded that the North Shore fell within the exception of Section 77, and even went so far as to say, "We think there can be no question but that this Road is not 'operating as a part of a general steam-railroad system of transportation.'" The 50 per centum freight revenue requirement was accorded great weight in the court's final determination, as was the district court's right, under the Bankruptcy Act, to make an independent determination of the Railroad's status. This decision interpreted a statute which differs materially from the Interstate Commerce Act in both its underlying purpose and in its jurisdictional tests. For this reason the 1942 Court of Appeals' decision was not binding on the Commission in the proceeding which is now being reviewed.

It is apparent from the decisions following the Supreme Court North Shore case that exemptions similar to Section 1(22), but which are found in other provisions of the Interstate Commerce Act,

or in other Acts, allow different interpretations, depending on the purpose of the Act, the underlying issues, and the particular facts of the case.

Upon holding that the Commission is not bound by the Supreme Court's determination in its classification of the North Shore, we must now decide the extent to which this court may review the jurisdictional classification made by the Interstate Commerce Commission in the present application for abandonment.

In United States v. Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936), the Supreme Court, in reviewing the findings of the district court which concluded that a branch of the Oregon Railroad was a "spur" under Section 1(22), held at page 109, 56 S.Ct. at page 692:

"The decree should be affirmed, because on findings amply supported by the evidence the trackage is a spur. Appellants object that, since the findings and order of the Interstate Commerce Commission were made on substantial evidence, they are conclusive, and that it was error to admit the testimony first offered in the District Court. * * * Although it would have been better practice to have introduced all relevant evidence before the Commission, as appellee's counsel concede, the court did not err in admitting the additional testimony. For whether certain trackage is a 'spur' is a mixed question of fact and law left by Congress to the decision of a court—not to the final determination of either the federal or a state commission."

The opinion by Justice Brandeis, while acknowledging that the district court had jurisdiction to determine the classification of the Oregon railroad, did not deny that the determination of the Commission should be given great weight. It merely concluded that the ultimate decision was left to the courts and not to the Commission.

In City of Yonkers v. United States, 320 U.S. 685, 64 S.Ct. 327, 88 L.Ed. 400 (1943), the Supreme Court was again called upon to review the findings of a district court in determining whether certain operations of the New York Central fell under the exception of Section 1(22). Although agreeing with Justice Brandeis that the determination of what is included within the exemption of Section 1(22) involves a "mixed question of fact and law," the Court nevertheless concluded that the Commission should first determine whether the railroad falls within its jurisdiction. In recognizing the importance of the Commission's findings, the Court said at pages 691–692, 64 S.Ct. at pages 330–331:

"It is hardly enough to say that the Commission's orders may be set aside by the courts where the Commission exceeds its authority. The Commission has a special competence to deal with the transportation problems which are reflected in these questions. The Congress has entrusted to the Commission the initial responsibility for determining through application of the statutory standards the appropriate line between the federal and state domain. * * * The insistence that the Commission make these jurisdictional findings before it undertakes to act not only gives added assurance that the local interests for which Congress expressed its solicitude will be safeguarded. *It also gives to the reviewing courts the assistance of an expert judgment on a knotty phase of a technical subject.*

* * * * * *

"This is not to insist on formalities and to burden the administrative process with ritualistic requirements. It entails a matter of great substance. It requires the Commission to heed the mandates of the Act and to make the expert determinations which are conditions precedent to its authority to act." (Emphasis supplied.)

The case was remanded and the Commission held that it had jurisdiction after it had made detailed subordinate findings of fact. The district court affirmed, Pub-

lic Service Commission of New York v. United States, D.C., 56 F.Supp. 351, and on review the Supreme Court sustained, 323 U.S. 675, 65 S.Ct. 130, 89 L.Ed. 548 (1944). The Court stated at page 675, 65 S.Ct. at page 130:

"On remand of the case * * * to the Interstate Commerce Commission for further findings, the Commission reopened the case, took further evidence, and made additional findings. Upon examination of the case now here on appeal we conclude that those findings are sufficient to support the order, and the evidence is sufficient to support the findings. The judgment is affirmed."

We think these two Supreme Court opinions settle the question of the scope of judicial review so that we may conclude that although this court is not bound by the determinations of the Commission and that the doctrine of "substantial evidence" is not specifically applicable, nevertheless great weight must be given to the determination of the Commission in an order such as this in which its special competence is clearly recognized.

In the instant abandonment proceeding, the Commission, in its Report On Reconsideration dated October 15, 1962, referred to its Interim Report of May 4, 1960, 312 I.C.C. 99, which in turn referred to the Commission's earlier decision in Chicago, N. S. and M. Ry. Abandonment, 290 I.C.C. 765 (1955), which authorized the abandonment of portions of the North Shore line. As stated by the Commission in its Report On Reconsideration, this 1955 decision contains a complete and comprehensive discussion of the jurisdictional facts relating to the North Shore. The Commission points out that these facts are at present essentially the same [2] and concludes that the North Shore does not fall within the exception contained in Section 1(22).

Plaintiffs neither dispute the underlying facts set out in 290 I.C.C. 765, nor that those facts remain essentially unchanged. The only question before us then is whether these facts have been properly interpreted and whether they support the Commission's conclusion that the North Shore does not fall within the exception contained in Section 1(22). We think that the Commission has upon an abundance of evidence correctly determined that the North Shore does not fall within the exception and is therefore subject to Section 1(18) of the Act.

We now turn to plaintiffs' contention that even if the North Shore is an interstate carrier over which the Commission has jurisdiction, and even if the evidence justifies a certificate of public convenience and necessity permitting abandonment, it must be limited to the interstate operations of the carrier.

The Commission, in authorizing abandonment of the entire system of the railroad, based its decision upon two grounds: (1) the North Shore crosses a state line; and (2) even if the North Shore's operations were confined to intrastate commerce, such restricted operations would constitute an undue burden upon interstate commerce.

2. "The physical characteristics of applicant remain essentially unchanged since our decision in Chicago, N. S. & M. Ry. Abandonment, supra. It continues to engage in the transportation of both passengers and property across the Wisconsin-Illinois State line. While it is principally a passenger carrier, we found in the cited decision (p. 769) that freight accounted for approximately 16.5 percent of its total operating revenues in 1953. The record herein discloses that in 1960 freight traffic accounted for about 14.6 percent of its total revenues. Practically all of the freight handled is interchanged with other railroads. Applicant's line is physically connected at six different points with one or more interstate carriers, namely the Elgin, Joliet & Eastern Railway, the Chicago, Milwaukee, St. Paul and Pacific Railway, the Minneapolis, St. Paul and Sault Ste. Marie Railroad, and the Chicago and North Western Railroad, and it continues to participate in more than 1,000 tariffs with class I trunk line carriers. We need not elaborate further. Other status-determining characteristics of applicant detailed in our decision cited above continue to be present."

The Commission has consistently asserted exclusive jurisdiction to authorize complete abandonment of a railroad line where the railroad operates such line in more than one state, Tonopah & T. R. Co. Abandonment, 236 I.C.C. 265; Missouri & Ark. Ry. Co. Receivers Abandonment, 271 I.C.C. 171.

■ Where a railroad physically crosses a state line and carries on both interstate and intrastate business over the same tracks in an integrated system of operation and where "the two services are inextricably intertwined" (Colorado v. United States, 271 U.S. 153, 164, 46 S. Ct. 452, 454, 70 L.Ed. 878), the Commission's exclusive jurisdiction over the railroad's interstate operations includes its intrastate operations as well. This conclusion is supported by the legislative history of the Interstate Commerce Act.

■ We agree with the Commission's well supported findings that the system-wide operations of the North Shore are not capable of a practical disjunction and hence the railroad fits squarely within the above rule.[3]

■ The Commission in its Report on Reconsideration also found a burden on interstate commerce even if the North Shore were permitted to operate solely as to intrastate commerce.[4] We think

3. "Applicant's line physically crosses the State boundary between Wisconsin and Illinois and it operates in both States, handling passengers, baggage and freight in intrastate and interstate commerce. Interline tickets are sold for transportation to and from points on its system and because of its connections with other interstate railroads, as heretofore mentioned, it is able to participate in freight bridge traffic. Its intrastate and interstate operations are co-mingled and are being conducted as part of the same service. In finding that public convenience and necessity permit the abandonment, we necessarily considered the entire operation and the needs of the public for both interstate and intrastate service. As we stated in our prior report after further hearing, all of applicant's present revenues from both interstate and intrastate operations are not sufficient to maintain the facilities necessary to safety of operation. It is obvious that revenues from intrastate operations alone would be insufficient to permit continued safe operations."

4. "It was also shown in our last report that the Chicago & North Western Railway Company (North Western) serves the considered area between Milwaukee and Chicago, its tracks being located slightly west of and generally parallel to the main line of applicant. The Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee) also operates in this area. Although it does not have comparable stations at all of the points served by the other two carriers, its line is located slightly east of the applicant's line, parallels it in part, and is separated by distances ranging from 0.25 mile to

2.4 miles. North Western has spent considerable sums for new cars and advertising to increase the patronage on its Milwaukee-Chicago trains. It sustained deficits amounting to approximately $2 million on these operations in 1958–1959, and, like applicant, has been faced with the problem of declining patronage.

"Each of the three railroads operating in this area are competitive for certain of their passengers moving in intrastate as well as interstate commerce. It is clear that the traffic is not sufficient to support all on a reasonably profitable basis. If applicant continues operations, either on the present basis or solely in intrastate commerce, it will carry passengers who otherwise would patronize the North Western or Milwaukee. Thus, the ability of those railroads to continue their present operations in interstate or foreign commerce should be improved by the proposed abandonment by applicant.

"It also is important to note that a certificate issued by us authorizing abandonment is permissive and, at applicant's election, the authority granted may or may not be exercised. If our certificate were limited to abandonment of operations in interstate and foreign commerce and the applicant were compelled by the States to continue intrastate operations over separate segments in Illinois and Wisconsin, the economics of the situation would dictate that applicant continue its interstate operations in order to minimize its losses. This would be so notwithstanding our finding that applicant's revenues are such as to make it difficult for a carrier to maintain its facilities in a manner that would insure safe operations. The likely result would be the

these findings are supported by the evidence.

▋ It is no longer open to doubt that where the operation of a railroad line, or a part of a line, vitally affects the revenues of an interstate carrier, the Commission may authorize abandonments not only of the interstate operations but also of the intrastate operations as well. Colorado v. United States, supra; Transit Commission v. United States, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342 (1932). While not dealing with railroads, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), a landmark case, makes this abundantly clear. There the Supreme Court quoted with approval the following language from United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726:

"The commerce power is not confined in its exercise to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce. * * * The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. * * * It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress. Hence the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power."

Plaintiffs cite Texas v. Eastern Texas Ry. Co., 258 U.S. 204, 42 S.Ct. 281, 66 L.Ed. 566 (1922), in support of the proposition that the Commission has no authority to affect the intrastate operations of the North Shore. This case is readily distinguishable. In Eastern Texas the court concluded that the railroad was entirely within a single state, was owned and operated by a corporation of that state, and was not a part of another line. It further concluded that interstate commerce would not be burdened or affected by its continued operation. In the case at bar, the North Shore operates in both Wisconsin and Illinois, and its intrastate and interstate operations cannot be separated realistically. Furthermore, the Commission found that the continued operation of any portion of the North Shore line would unreasonably burden interstate commerce.

There seems to be no contention by plaintiffs that the evidence is insufficient to justify the issuance of a certificate of public convenience and necessity authorizing abandonment if it is limited solely to interstate operations, provided their position with respect to Section 1 (22) is held to be unsound. Indeed, we do not see how such a contention could very well be made in the face of the findings of fact upon which the certificate is based.

▋ In its Report dated May 10, 1962, the Commission found that "the present revenues have not been, and future revenues will not be, sufficient to cover the cost of applicant's continued operation with sufficient maintenance of facilities necessary to safety of operation * *." This conclusion is justified by the evidence. The outstanding single fact supporting this conclusion is that the North Shore for a thirty-year period covering the years 1932 through 1961 (except during the World War II years 1941–1946) has sustained large operating losses. The Commission found that if normal maintenance were included in the North Shore costs, it would result in deficits of $624,000 in 1959; $693,000 in 1960; and

safety of interstate as well as intrastate passengers would be endangered.

"We conclude that the continued operation of the applicant's line, even if confined to intrastate commerce, would constitute an undue burden upon interstate commerce."

$762,000 for the year ending May 31, 1961. The actual operating deficits for the years 1955 to 1961 are set out below.[5]

Since we have determined that the Commission had jurisdiction to authorize abandonment of the intrastate as well as the interstate operation of the railroad, we now conclude that the evidence justified the issuance of the certificate.

Accordingly, the complaint herein is dismissed and the counterclaim requesting that the plaintiffs and each of them, their agents, employees and attorneys be enjoined by the decree of this court from in any manner interfering with the defendant's right to terminate its entire operations and dispose of its property all in accordance with and pursuant to the authority conferred by the certificate of the Interstate Commerce Commission in its order and certificate issued May 10, 1962, is granted. A decree consistent herewith will be entered.

5. "Year — Operating deficit

| Year | Operating deficit |
|------|------------------|
| 1955 | $661,874 |
| 1956 | 515,067 |
| 1957 | 603,413 |
| 1958 | 462,615 |
| 1959 | 398,835 |
| 1960 | 468,239 |
| Ended May 31, 1961 | 539,872" |