**INTERSTATE COMMERCE COMMIS-SION, Plaintiff,**
City of Memphis, Tennessee,
and
**Railway Labor Executives' Association, Intervenor-Plaintiffs,**
v.
**MEMPHIS UNION STATION COMPANY et al., Defendants.**
Civ. A. No. 5192.

United States District Court
W. D. Tennessee, W. D.
June 12, 1964.

Thomas L. Robinson, U. S. Atty., Memphis, Tenn., for plaintiff.

Patrick Johnson, Sr., City Atty., Memphis, Tenn., for City of Memphis, intervening petitioner.

458

William F. Kirsch, Jr., Memphis, Tenn., for Railway Labor Executives' Ass'n, intervening petitioner.

Edward P. Russell, Memphis, Tenn., for Memphis Union Station Co., Missouri Pac. R. Co., Union Ry. Co. and St. Louis S. W. Ry. Co.

John Mack, Memphis, Tenn., for Louisville & N. Ry. Co.

Jesse Johnson, Jr., Memphis, Tenn., for Illinois Cent. R. Co.

Harry Laughlin, Memphis, Tenn., for Southern Ry. Co.

BAILEY BROWN, District Judge.

This is an action filed by the Interstate Commerce Commission (I.C.C.) against several railroads and a railroad passenger terminal operating company seeking an injunction requiring three of these railroads to continue to use this abandoned terminal and to cease using certain other passenger terminals. The City of Memphis (City) and the Railway Labor Executives' Association (Labor Association) have intervened as additional plaintiffs.

Plaintiffs rely on 49 U.S.C. § 1(18) which, in general, requires a certificate of public convenience and necessity before a line of railroad may be abandoned. They also rely on § 5(2) and § 5(4) which provide, in general, that I.C.C. approval must be obtained before trackage rights on a line of railroad may be acquired.

For jurisdiction, plaintiffs rely on § 1(20), which authorizes the issuance of an injunction to prohibit an abandonment contrary to the provisions of § 1 (18), and rely on § 5(8), which authorizes the issuance of an injunction to prohibit an acquisition of trackage rights contrary to the provisions of § 5(2) and § 5(4).

Plaintiffs seek both a temporary and a permanent injunction, and a hearing on the application for a temporary injunction has been had. At this hearing, defendants took the position that I.C.C. approval of what has been done was not necessary and that, in any event, a temporary injunction should not issue in this action.

The affidavits which have been filed and the evidence introduced at the hearing establish the relevant facts without dispute.

The defendant Memphis Union Station Company (Union Station), which owns and has operated this passenger terminal in the City, was formed in 1909, its stock being owned by the defendant Louisville & Nashville Railroad Company (L & N), the defendant Southern Railway Company (Southern), the defendant Missouri Pacific Railroad Co. (Mo Pac), and the defendant St. Louis Southwestern Railway Co., which has been referred to in the record and which will be referred to herein as the "Cotton Belt." The terminal building, tracks and other facilities were completed in 1912. Thereafter these railroads, as tenants of their subsidiary terminal company, had used this passenger terminal down to around April 1, 1964, except that the Cotton Belt ceased operating passenger trains into the City in 1952.

The Union Station fronts on Calhoun Avenue to the north and stub-end terminal tracks, which Union Station used for receiving and discharging passengers and mail, for cleaning and minor repairs to passenger trains, and for switching and making up of passenger trains, are immediately to the south of the terminal building. There are about twelve of these tracks, all of which run north and south, each with a platform and overhanging shed. Immediately to the east of and parallel to these tracks is another series of tracks used for storage of cars and heavier repairs.

Passenger trains using the Union Station approach on a group of main line east-west tracks immediately to the south of the terminal property, running perpendicular to the terminal tracks. The Southern and L & N passenger trains, which enter the City from the east, run to the west of the Union Station on their main line tracks and then back into the station. The defendant

Union Railway Co., a wholly owned "belt-line" subsidiary of Mo Pac, owns two of these east-west main line tracks. Mo Pac trains, which enter the City from the west, run to the east of the station on one of these Union Railway tracks and then back into the station.

These main line east-west tracks to the south of the Union Station terminal are joined with the stub-end terminal tracks by two sets of lead tracks which are, looking from the south, arranged in an inverted Y. This arrangement enabled Southern and L & N trains to back in from the west over the west branch of the Y and to depart over the east branch and enabled Mo Pac trains to back in from the east over the east branch of the Y and to depart over the west branch.

To handle trains passing the Union Station on these main line tracks and to handle passenger trains backing in and departing from the station, an interlock system is used. Simply stated, the interlock is a system of centrally controlled switches and signals. These switches and signals are located on these east-west main line tracks and also on the tracks on the terminal property. To illustrate how the interlock is used, a Southern passenger train approaching from the east enters the interlock area, continues to the west until its rear car is clear of the interlock switches, then a series of switches is thrown and signals are set so that the train may be backed across other main line tracks into the west branch of the Y lead tracks and then into the appropriate terminal stub-end track.

The interlock switches are electropneumatically controlled from a tower which has been owned and operated by the Union Station and receives its electricity and air from a power plant also owned and operated by the terminal company.

Subsequent to January 1, 1964, the I.C.C. received letters from employees of Union Station, advising that Southern, L & N and Mo Pac planned to terminate operations and their employment there effective April 1, 1964. Accordingly, on February 27, 1964, the I.C.C. directed letters to each of these defendant railroads, inquiring as to their intentions.

Thereafter, in an exchange of letters, Mo Pac advised the I.C.C. that the lease of the tenant lines at Union Station would expire on April 1, that Mo Pac intended to use passenger terminal facilities of its subsidiary Union Railway, and that in its opinion approval of this move by the I.C.C. was not necessary. L & N advised the I.C.C. that it likewise intended to end operations at Union Station with the expiration of the lease, which, in its opinion, did not require I.C.C. approval, and that it intended to use the terminal facilities of the defendant Illinois Central Railroad Co. (Illinois Central). Southern did not respond in writing to the I.C.C. initial inquiry or other correspondence, but counsel for Southern advised I.C.C. verbally that if Mo Pac and L & N terminated operations at Union Station, it would do the same and would make use of other terminal facilities.

The I.C.C. advised Mo Pac, Southern and L & N that in its informal opinion approval was necessary and invited them to apply for approval and to make a contemporaneous motion to dismiss the application for lack of jurisdiction.

By copies of this correspondence sent to them, Union Station, Union Railway, Cotton Belt and Illinois Central were informed of the position of the I.C.C. and of the Southern, L & N and Mo Pac. Cotton Belt advised the I.C.C. that it was not involved in the controversy because it had not operated passenger trains into the City since 1952 and was only a stockholder of Union Station.

Thereafter, on or about April 1, 1964, Southern, Mo Pac and L & N terminated operations at Union Station.

Southern began using, as a passenger terminal, a building and adjoining tracks which it had last used for that purpose over fifty years ago but which it has been using and is still using as

a freight depot. This building is 1.8 miles from Union Station. Mo Pac began routing its passenger trains over tracks to a building which it had existing rights to use through its subsidiary Union Railway. This building has not been used as a passenger terminal in over fifty years. It is likewise located on Calhoun Avenue and about four blocks west of Union Station. L & N began using the terminal facilities of Illinois Central, which are comparable to those of Union Station. For many years these facilities and Union Station have been the only passenger terminal facilities in use in the City. The Illinois Central terminal is likewise located on Calhoun Avenue (about two blocks west of Union Station), and its terminal stub-end tracks also come in from the south and are connected with these same east-west main line tracks. To enter the terminal, L & N trains, approaching from the east on its main line, run past Union Station and continue on its main line to a point west of the Illinois Central terminal. Then the trains are backed, using a system of switches, off the main line and onto the appropriate stub-end track in the terminal. To accomplish this change of terminals, the only trackage rights necessary for L & N to acquire were rights over a lead track from its main line to the stub-end terminal tracks and rights to use the stub-end tracks.

Shortly after the termination of operations at Union Station, 120 of its employees were discharged, of whom about 75 have not obtained other employment. It is in behalf of these discharged employees that the Labor Association has intervened.

On March 25, the Tennessee Public Service Commission (Commission) issued an order to Southern, L & N, Mo Pac, Cotton Belt and Union Station to show cause why their intended cessation of the use of the Union Station terminal would not constitute a violation of Tennessee statutes and the rules of the Commission. On April 3, a hearing was had on the show cause order and on April 7 the Commission ordered restoration of service at the terminal by April 12. By proper appellate proceedings in the state Chancery Court, this order was reviewed and on April 13 and 14 that Court held (for various reasons) that the order of the Commission was invalid as to Mo Pac, Cotton Belt and Union Station, but it affirmed the order of the Commission as to L & N and Southern. On April 14, the Commission held Southern and L & N in contempt for failure to comply with its order. On April 27, a justice of the Tennessee Supreme Court granted the application of Southern and L & N for certiorari and supersedeas. L & N (and perhaps Southern) have applied to the Commission for approval of what they have done, but the Commission has deferred the hearing thereon, pending decision of this action in this court. The Commission has sought review in the Tennessee Supreme Court of the action of the Chancery Court in holding that its order is invalid as to Mo Pac, Cotton Belt and Union Station.

As indicated, the two broad issues presented for consideration at the hearing are: (1) whether I.C.C. approval was necessary before L & N, Mo Pac and Southern could cease passenger operations at Union Station and institute service at other locations as they have done; and (2) whether, in any event, a preliminary injunction should issue.

### Necessity of I.C.C. Approval

As also stated, plaintiffs rely on 49 U.S.C., § 1(18), which requires I.C.C. approval before a line of railroad may be abandoned and § 5(2) and § 5(4), which require such approval before trackage rights over or joint use of a railroad line and terminals incidental thereto may be acquired. Applied to these facts, plaintiffs contend that, in ceasing operations at Union Station, Southern L & N, Mo Pac and Union Station have abandoned a line of railroad and that, at least in the case of the L & N's use of Illinois Central facilities, there has been an acquisition of track-

age rights over and joint use of a railroad line and terminal incidental thereto.

Defendants concede that § 1(18), § 5 (2) and § 5(4) are the applicable and determinative statutory provisions but contend that there has not been, within the meaning of these provisions, an abandonment or an acquisition.

■■ It should be pointed out that the answers to these questions are determinative of the jurisdiction of the I.C.C. to hear and make an adjudication as to public convenience and necessity. And as the matter is before this court on an application by the I.C.C. for an injunction, it is solely for this court to determine whether the I.C.C. has jurisdiction. Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643 (1937).

Turning now to those provisions of Sec. 1(18) which have to do with the abandonment of a line of railroad, and Sec. 5(2) and Sec. 5(4) which have to do with the acquisition of trackage rights over and joint use of a railroad line, we quote here the relevant parts of these sections:

"§ 1(18) * * *

" * * * [N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. * * *"

"§ 5(2) * * *

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

* * * * * *

"(ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto."

"§ 5(4) * * *

"It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section * * *."

There are, however, specific exceptions to these provisions contained in the statutes. Sec. 1(22) contains an exception to the requirement of Sec. 1(18) that an abandonment have I.C.C. approval, which exception reads as follows:

"§ 1(22) * * *

"The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State * * *."

Sec. 1(18) contains an exception to the requirement of Sec. 5(2) and Sec. 5(4) that an acquisition have I.C.C. approval, which exception reads as follows:

"§ 1(18) * * *

" * * * Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

Plaintiffs first argue that, in interpreting § 1(18), § 5(2) and § 5(4), we should look to the whole statutory scheme for regulating railroads contained in Part I of 49 U.S.C. Then plaintiffs point out that Union Station, as a "common carrier by railroad," is subject to I.C.C. regulation in many respects and argue that it would be anomalous to hold that the I.C.C. may regulate in these respects and yet have no power to prevent the complete cessation of operations at the station.

Defendants concede that Union Station is a "common carrier by railroad"

within the meaning of Part I and as such is subject to regulation in some respects. They contend, however, that this power to regulate in other respects is no indication of a Congressional intent to treat Union Station or its tracks as a "line of railroad" and vest the I.C.C. with the power to prohibit the cessation of operations over these tracks.

We believe that the substantial power admittedly vested in the I.C.C. to regulate Union Station, as a common carrier by railroad, is at least some indication of an intent to treat terminals and terminal tracks as part of a "line of railroad" under § 1(18). For instance, under Sec. 3(5) the I.C.C. is vested with the authority under some circumstances to order one common carrier by railroad to allow another to use jointly its terminal facilities. Under Sec. 26 the I.C. C. is vested with authority to require any "common carrier by railroad," which is expressly defined in § 26(a) to include "any terminal or station company," to install block signal systems, interlocking, automatic train stop and other similar appliances. Under Sec. 6 the I.C.C. is vested with authority to require "every common carrier" to file tariffs setting forth their "rates, fares and charges." The Union Station Company has a tariff on file with the I.C.C. setting forth its charges for "redcap service", pursuant to this section. Sec. 20a(12) prohibits an officer or director of a carrier from serving in such capacity with another common carrier without approval by the I.C.C. Officers and directors of the Union Station Company have acquired authorization under this section. Under Sec. 20(1) (2) (5) (9) the I.C.C. is authorized to require reports from railroad terminal companies. The Union Station has filed annual reports in compliance with this section. To reiterate, it seems unlikely that a common carrier by railroad, subject to such extensive regulation under other provisions of the Act, was intended to be allowed to abandon *all* of its operations without approval of the I.C.C. pursuant to Sec. 1(18).

We understand the defendants' argument, with respect to Sec. 1(18) is, in outline, as follows. The words "line of railroad", construed in the light of the limitations in Sec. 1(22), mean "main line tracks" of railroad. Therefore, they argue that even if the Union Station tracks are not "spur" or "switching", etc., tracks, their abandonment is nevertheless not within the jurisdiction of the I.C.C. since they are not "main line tracks." Alternatively, defendants argue that Union Station tracks are spur or switching tracks and therefore come squarely within the exception contained in Sec. 1(22).

In addition to relying on the entire statutory scheme, contained in Part I of the Act, for regulating common carriers, we understand the plaintiffs' further argument, with respect to Sec. 1 (18) is, in outline, as follows. The words "line of railroad" cover all trackage except that specifically excluded by Sec. 1(22) and the Union Station tracks are not spur or switching tracks and therefore are not excluded by Sec. 1(22). Alternatively, plaintiffs argue that even if the words "line of railroad" mean "main line tracks," the Union Station tracks are actually main line tracks.

While we think it is useful to define the arguments of the parties in general terms, as we have just done, we also think that it is important to point out that the reasoning of the adjudicated cases does not necessarily fit into this analysis of plaintiffs or defendants.

There are other provisions in Part I of the Act which give aid in construing the words "line of railroad" in Sec. 1 (18) and the words "spur" and "switching" in Sec. 1(22).

In Sec. 1(3) (a) the term "railroad" is defined as including " * * * all switches, spurs, tracks, terminals, and terminal facilities * * * freight depots, yards and grounds * * *." It therefore appears that the Act recognizes terminals and terminal facilities as a category separate from spurs and switches. This is an indication that terminal tracks are not meant to be exclud-

ed from I.C.C. jurisdiction by Sec. 1(22). Furthermore, the fact that the statute thus defines "railroad" as including "terminals" and "terminal facilities" is at least some indication that terminals or terminal tracks may be a part of a "line of railroad" within the meaning of Sec. 1(18). See Abandonment of Line by Chicago, etc. Ry. Co., 131 I.C.C. 421 (1927).

In Sec. 1(15) (c) and Sec. 3(5) of the Act the I.C.C. is vested with authority, under certain circumstances, to require joint use of " * * * terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal * * *." Again, we see that terminal facilities are recognized as a separate category for regulatory purposes. Also, we see that "main-line tracks" are likewise recognized as a separate statutory category, indicating that they are not the same as a "line of railroad." If "line of railroad" does not mean the same thing as main line track, certainly it must be deemed to be a broader and more inclusive term.

A leading case in this area is Railroad Commission of California v. Southern Pacific Co., 264 U.S. 331, 44 S.Ct. 376, 68 L.Ed. 713 (1924), which is relied upon by both plaintiffs and defendants. There the Railroad Commission ordered three railroads to construct in Los Angeles a new union terminal and tc move their passenger operation to that terminal when constructed. The railroads attacked the order of the Railroad Commission in the California courts, contending that compliance would constitute an abandonment under Sec. 1(18) and therefore I.C.C. approval would be required. The California Supreme Court held that the railroads need not comply for the reason asserted by the railroads, and the Supreme Court of the United States, for the same reason, affirmed.

There is language in this opinion to support defendants' contention that Sec. 1(18) does not apply unless main line track is to be abandoned, but there is also language in the opinion that Sec. 1(18) applies if a passenger terminal and its tracks are to be abandoned. However, since main line track was admittedly involved, it was clear without question that Sec. 1(18) was applicable and therefore any discussion as to whether main line track must be involved is *dicta*.

An example of language in the opinion supporting defendants' contention may be found at page 345 of 264 U.S., at page 379 of 44 S.Ct.:

"This is a palpable distinction between the main tracks of an interstate carrier, and its spur, industrial, switching or side tracks, and shows the legislative intention to retain any substantial change in the main tracks within the control of the Interstate Commerce Commission. It may well be that a mere relocation of a main track of an interstate carrier which does not involve a real addition to, or abandonment of, main tracks and terminals, or a substantial change in destination, does not come within the paragraphs 18 to 21. One might, too, readily conceive of railroad crossings, or connections of interstate carriers in which the exercise by a state commission of the power to direct the construction of merely local union stations or terminals without extensions of main tracks and substantial capital outlay should be regarded as an ordinary exercise of the police power of the state for the public convenience and would not trench upon the power and supervision of the Interstate Commerce Commission in securing proper regulation of an interchange of interstate traffic or passengers."

An example of language supporting plaintiffs' contention may be found at pages 343 and 344, of 264 U.S., at page 378 of 44 S.Ct.:

"It is obvious from the foregoing that Congress intended to place under the superintending and fostering direction of the Interstate Commerce Commission all increased facilities in the matter of distribution of cars and equipment and in joint

terminals, in the exchange of interstate traffic and passengers between railways so as to make it prompt and continuous. It not only provides for the temporary expropriation of terminals and main track of one railway to the common use of one or more other railways in an emergency, but it also contemplates the compulsory sharing of one company's terminals with one or more companies as a permanent arrangement. This is a drastic limitation of a carrier's control and use of its own property, in order to secure convenience and despatch for the whole shipping and traveling public in interstate commerce. It gives to the Interstate Commerce Commission the power and duty, where the public interest requires, to make out of what is the passenger and freight station of one interstate carrier a union station or depot."

We think a careful reading of this entire opinion will make it clear that the Court was not considering the precise question whether abandonment of terminal track requires I.C.C. approval.

The courts have held that the exceptions contained in Sec. 1(22) should be strictly construed. Piedmont etc. Ry. Co. v. I.C.C., 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115 (1932); Lancaster et al. v. Gulf, etc. Ry. Co., 298 F. 488 (S.D. Tex., 1924); Chicago etc. Ry. Co. v. Northern Pacific Ry. Co., 120 F.Supp. 710 (W.D.Wash., 1954). In the Piedmont case, it is said at page 311 of 286 U.S., at page 545 of 52 S.Ct.:

"The Transportation Act was remedial legislation, and should therefore be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to effect the remedy intended."

Even where an exception contained in Sec. 1(22) was on its face clearly applicable to proposed construction of trackage, the Supreme Court held the I.C.C. had jurisdiction since " * * * its purpose and effect are * * * of national concern." Texas & Pacific Ry. Co. v. Gulf etc. Ry. Co., 270 U.S. 266, at page 278, 46 S.Ct. 263, at page 266, 70 L.Ed. 578 (1926).

The I.C.C. has ruled on several occasions that while Sec. 1(18) does not necessarily give it jurisdiction with respect to abandonment of certain terminal buildings as such, it has also ruled that it has jurisdiction with respect to abandonment of terminal trackage. For example, in Boston Terminal Co. Reorganization, 312 I.C.C. 373 (1960), the I.C.C., in holding that it did not have jurisdiction to grant or deny approval of the sale and lease-back of a terminal *building* where the building would continue in use as a terminal building, was careful to point out that its earlier holding in another case "was not a categorical holding that all stations, whatever their character and relation to transportation, are outside the authority granted by § 1(18); for 'a line of railroad' does not cease to be such merely because it is called, or embraced within, a 'station'."

The other case referred to by the I.C.C. in the Boston Terminal opinion was Public Convenience Application of Kansas City, etc. Ry. Co., 94 I.C.C. 691 (1925), where the I.C.C. ruled that it had no jurisdiction with respect to abandonment of a depot building but did have jurisdiction with respect to abandonment and construction of "terminal tracks." In Abandonment of Line by Chicago, etc. Ry. Co., 131 I.C.C. 421 (1927), the I.C.C. ruled that it had jurisdiction with respect to abandonment of terminal tracks and apparently even terminal buildings.

The I.C.C. ruling that most strongly supports defendants' position, upon which ruling defendants have heavily relied since the beginning of this controversy, is Boston and Albany Ry. et al. Abandonment, 312 I.C.C. 458 (1961). Involved there was the main line trackage, consisting of four tracks, of the Boston and Albany running west from Boston through Newton to Riverside and

beyond. Passenger trains entered Boston over these tracks and proceeded into South Station. The Turnpike Authority, in constructing an expressway into Boston, desired to acquire part of the railroad right of way for the entire distance from Riverside to Newton. Therefore, it was proposed that two of the four main line tracks be taken out of service. The Authority desired to acquire all of the right of way for the entire distance between Newton and South Station. Therefore, it was proposed that all four tracks be taken out of service and two new tracks be constructed between these points and a short distance to the north of the old right of way. The railroad also proposed to move some passenger depots along the way so that they would have access to the main line tracks as so rearranged. The I.C.C. ruled that it had no jurisdiction under Sec. 1(18).

With respect to the two tracks to be taken out of use between Riverside and Newton, the I.C.C. concluded at page 463:

"The removal of two of the four multiple main line tracks between Newton and Riverside heretofore described will still leave the applicants with a line of railroad between those points. For this reason, and for the further reason that there will be no change in the present train service, we conclude that the proposed removal does not constitute an abandonment of a line of railroad as contemplated by section 1(18). Such removal, therefore, is not within our jurisdiction. The applicants' motion to dismiss that portion of the application will be granted."

With respect to the four tracks, which were to be replaced by two new tracks, between Newton and South Station, the I.C.C. concluded at page 463:

"From the facts above stated it is also clear that the remaining portion of the application in Finance Docket No. 21263, i. e., removal of tracks between South Station and Newton, and that seeking construction between South Station and Newton in Finance Docket No. 21264, considered together cannot be said to constitute an abandonment or construction of a line of railroad within the meaning of section 1(18). Applicants' entire line, after such removal and construction, will remain in service as before and will render exactly the same service. Compare Philadelphia, N & N Y R Co. Application, 67 I.C.C. 252. We are of the opinion that such proposal constitutes only a relocation of a portion of the applicants' line. Insofar as the applications in Finance Dockets Nos. 21263 and 21264 seek authority to abandon, construct, and operate, such applications will thus be dismissed for want of jurisdiction."

Thus the I.C.C. reached the result that the Boston and Albany proposal did not involve the "abandonment" or the "construction" of "a line of railroad" within the meaning of Sec. 1(18). Nevertheless, in the opinion, there is the following language at page 461:

"The entire present roadway between Riverside and Boston, which embraces the portion of track removal and that of *abandonment*, consists of four multiple main line tracks. Under the proposals the applicants will have two tracks for the full distance. Thus, after the track removal, *abandonment* and *construction, a line of railroad* between the two points will remain." (Emphasis ours)

It therefore appears that the I.C.C. concluded that even though the railroad's proposal involved an abandonment and construction of main line track, this did not constitute an "abandonment" and "construction" in the statutory sense because it was clear that the public convenience would in no wise be affected by the proposal.

It is, of course, true that it must be determined that the I.C.C. has jurisdiction before the I.C.C. has the authority to make an adjudication as to public con-

venience and necessity and grant or deny a certificate. It also appears, however, that in determining whether there is jurisdiction, an important fact that must be considered is the possible effect on the public and the railroads of proposed changes in operations.

■ The courts, as well as the I.C.C., have taken the view that the question whether there is an "abandonment" or "construction" of a "line of railroad" within the meaning of Sec. 1(18) is to be answered, in part, by consideration of the possible effect on the public and the railroads. In the Southern Pacific case, supra, the Supreme Court emphasized the high cost of the proposed changes to the railroads. In Texas and Pacific Ry. v. Gulf etc. Ry., 270 U.S. 266, 46 S.Ct. 263 (1926), the Supreme Court held that in determining whether the track involved in that case was "industrial" track within the meaning of Sec. 1(22) or a "line of railroad" within Sec. 1(18), it was proper to consider that its "purpose and effect" were of "national concern." In the case of City of Des Moines, Iowa v. Chicago etc. Ry. Co., 264 F.2d 454 (C.A.8, 1959), the Court said at page 458:

"With the term 'abandonment' being related in the statute to the question of public convenience and necessity, the courts must recognize the significance of this intertwining and allow the meaning which is thus mixed into the term to have its full play."

■ At the hearing on the application for a preliminary injunction, evidence was offered by plaintiffs and by defendants as to the economic effect on the railroads of being required to maintain operations at Union Station and as to the effect on the public and Union Station employees if the railroads were allowed to continue operations at the other terminals. At the time of hearing, this court was of the opinion that this evidence was admissible only on the

issue as to whether the situation was of such urgency as to require a preliminary injunction. However, as we just indicated in this opinion, we now have the view that this evidence is relevant on the ultimate question to be determined, i. e., whether the I.C.C. has jurisdiction because there has been an abandonment or acquisition of a line of railroad within the meaning of Sec. 1(18) and Sec. 5(2). We should make it clear, however, that in considering this evidence in connection with the ultimate issue involved here, we are considering it only for purpose of making a jurisdictional determination and not for purposes of determining whether a certificate should be granted or denied—a matter left solely for determination by the I.C.C. Moreover, in considering this evidence in connection with the ultimate issue in this case, we are not concerned with the precise effect of the railroads' actions on themselves and the public; we are only concerned with whether that effect is of sufficient significance to indicate the need for I.C.C. attention. Again, we emphasize that this is only one of the factors, although an important factor, in determining whether the I.C.C. has jurisdiction.

While there was dispute at the hearing as to extent of the disparity between Union Station facilities and the terminal facilities now being used by Mo Pac and Southern, there seems to be no real doubt that the Union Station facilities are much better.* It is clear that the cessation of operations at Union Station has affected the interchange of passengers in interstate travel. It is also clear that 120 Union Station employees have lost their jobs and 75 remain unemployed.

■ Taking into consideration the language of and the apparent policy of the statute, the cases construing the statute, the character of the tracks and the operations thereover, and the effect on the public and on the employees of Union Station, we have concluded that at

* There is no evidence or contention that the L & N facilities at the Illinois Central terminal are not equal to those at Union Station. Moreover, the I.C.C. might well determine that the Southern and Mo Pac facilities are adequate.

least some of the tracks at Union Station do constitute a "line of railroad" within the meaning of Sec. 1(18) of the Act and conversely are not "spur" or "switching" tracks within the meaning of Sec. 1(22); and further that the cessation of operations over these tracks constitutes an abandonment and not a mere relocation. Accordingly, Union Station, L & N, Southern and Mo Pac have abandoned a line of railroad in violation of the provisions of Sec. 1(18).

We have further concluded that some of the tracks at Illinois Central terminal are likewise a "railroad line" within the meaning of Sec. 5(2) of the Act and conversely are not "spur" or "switching" tracks within the meaning of Sec. 1(18) of the Act; and further that the institution of operations there by L & N constitutes an acquisition of trackage rights and not a mere relocation. Accordingly, L & N has acquired trackage rights over or joint use of a line of railroad in violation of Sec. 5(2) and 5(4) of the Act.

Union Station makes the separate argument that there could be no abandonment so far as it is concerned because there has been a complete cessation of demand for its facilities. Even if Union Station is correct in this contention, this would have no practical effect on this litigation, because if the tenant railroads have abandoned Union Station in violation of Sec. 1(18), any injunction to which plaintiffs are entitled would of necessity run against Union Station. McGrody v. B & O Ry. Co., 217 F.Supp. 252 (E.D.Pa., 1963), relied upon by Union Station, is not apposite because in that case there was no demand from the public or the railroads for the services of the tug boat involved which had been used to move trains. Here there is demand from the public, through the City, for the services at Union Station.

Although the lease of the tenant lines at Union Station expired by its terms on April 1, 1964, the tenant lines do not contend that the expiration of the lease affects the question whether there has been an abandonment. They are correct in making this concession. Smith v.

Hoboken Ry. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123, 168 A.L.R. 497 (1946).

## REMEDY

Since the facts determinative of the issues are not in dispute, and it is clear under the applicable law that plaintiffs are entitled to some relief, there remains to be decided only the extent and nature of the relief to which plaintiffs are entitled.

We have held that there has been an unlawful abandonment of a "line of railroad" at Union Station in violation of Sec. 1(18) and an unlawful acquisition of a "railroad line" at the Illinois Central terminal in violation of Sec. 5(2) and 5(4). It seems to have been assumed by plaintiffs, and even by defendants, that if plaintiffs are ultimately entitled to prevail as against all defendants, proper relief would be to require the restoration of operations at Union Station just as they existed prior to April 1, 1964. It does not necessarily follow, however, that the relief should be this complete.

In the first place, while we are clear that there has been an unlawful abandonment of a "line of railroad" at Union Station in that at least some of the tracks there constitute a "line of railroad," it is not so clear whether all of the tracks and the terminal building itself constituted or were parts of a line of railroad and were unlawfully abandoned.

In the second place, while complete cessation of operations over a line of railroad clearly constitutes an abandonment, it is far from clear how far operations may be reduced or how far the nature of services rendered may be altered before an abandonment would take place in violtaion of Sec. 1(18). These matters having to do with reduction and changing the nature of services are normally regulated by state regulatory bodies.

Plaintiffs here seek only injunctive relief against an unlawful abandonment and an unlawful acquisition, and it would seem to follow that in granting relief,

this court could go no further than to require the defendants to cease their violation of Sec. 1(18) and Sec. 5(2) and Sec. 5(4). These questions as to the relief plaintiffs are entitled to should receive the particular attention of the parties at the plenary hearing which will be held on this matter.

We do believe that plaintiffs are entitled to a preliminary injunction, enjoining defendant Union Station from disposing, without leave of court, any of the remaining property now held by it and used by it prior to April 1, 1964 in operating the terminal and terminal facilities.

Plaintiffs will prepare and submit an order in this cause.