INTERSTATE COMMERCE COMMISSION, Plaintiff-Appellee,

and

City of Memphis, Tennessee, and Railway Labor Executives' Association, Intervenor-Plaintiffs-Appellees,

v.

MEMPHIS UNION STATION COMPANY, Missouri Pacific Railroad Company, Union Railway Company, Louisville and Nashville Railroad Company, Illinois Central Railroad Company, St. Louis Southwestern Railway Company, Southern Railway Company, Defendants-Appellants.

Nos. 16466–16471.

United States Court of Appeals
Sixth Circuit.

March 31, 1966.

Francis M. Shea, Washington, D. C., for Louisville & Nashville R. Co., Southern Railway Co., Missouri Pacific Railway Co., Memphis Union Station Co. and Union Railway Co., Jesse E. Johnson, Jr., Memphis, Tenn., Joseph L. Lenihan, James W. Holland, Louisville, Ky., John B. Mack, Memphis, Tenn., on the brief, for Louisville & N. R. Co. and Illinois Cent. R. Co. and Burch, Porter & Johnson and Clifton, Mack & Kirkpatrick, Memphis, Tenn., of counsel; William D. McLean, Peter S. Craig, Washington, D. C., Harry W. Laughlin, Jr., Memphis, Tenn., on the brief, for Southern Ry. Co., and Laughlin, Watson, Creson, Garthright & Halle, Memphis, Tenn., of counsel; Mark M. Hennelly, Gilbert P. Strelinger, St. Louis, Mo., Edward P. Russell, Memphis, Tenn., on the brief, for Missouri Pac. R. Co., Canada, Russell & Turner, Memphis, Tenn., of counsel; Edward P. Russell, Memphis, Tenn., on the brief for Memphis Union Station Co., on the brief, Canada, Russell & Turner, Memphis, Tenn., of counsel.

James W. Hoeland, Louisville, Ky., for Louisville & N. R. Co., and Illinois Cent. R. Co., Jesse E. Johnson, Jr., Memphis, Tenn., Joseph L. Lenihan, Louisville, Ky., John B. Mack, Memphis, Tenn., on the brief, Burch, Porter & Johnson and Clifton, Mack & Kirkpatrick, Memphis, Tenn., of counsel.

Edward P. Russell, Memphis, Tenn., for St. Louis Southwestern Ry. Co., Clyde W. Fiddes, Tyler, Tex., on the brief, Canada, Russell & Turner, Memphis, Tenn., of counsel.

Harvey Gobetz, Washington, D. C., for Interstate Commerce Commission, Marcus L. Meyer, Interstate Commerce Commission, Washington, D. C., Thomas L. Robinson, U. S. Atty., Memphis, Tenn., on the brief.

William J. Hickey, Washington, D. C., for Railway Labor Executives' Assn., William F. Kirsch, Jr., Memphis, Tenn., James L. Highsaw, Jr., William G. Mahoney, William J. Hickey, Jr., Washington, D. C., on the brief, Heiskell, Donelson, Adams, Williams & Wall, Memphis, Tenn., Mulholland, Hickey & Lyman, Washington, D. C., of counsel.

Patrick Johnson, Sr., City Atty., Memphis, Tenn., for City of Memphis, Arthur J. Shea, S. A. Wilbun, Asst. City Attys., Memphis, Tenn., on the brief.

Before EDWARDS and CELEBREZZE, Circuit Judges, and KENT, District Judge.*

EDWARDS, Circuit Judge.

The Interstate Commerce Commission filed these complaints in the United States District Court for the Western District of Tennessee. The complaints sought injunctions to restrain five railroads [1] and the Memphis Union Station Company from abandoning operations at the Memphis Union Station without prior ICC approval of both the abandonment and the railroads' alternate arrangements.

Prior to the commencement of these actions, the railroads in question (in the face of an ICC warning) had actually abandoned service to the Union Station and each of the operating railroads had found other passenger terminal facilities.

The cessation of operations was accomplished without application for abandonment of lines of railroad to the ICC and the substituted service was accomplished without application for approval of the agreement for extension of service to the other terminals.

The City of Memphis intervened to argue against the abandonment of the Union Station on behalf of the city and its citizens, and a representative of the Railway Labor Executives' Association intervened to contend that the interests of the jobs of 120 people who had been laid off by the closing of the Union Station should be taken into account likewise, and would be if the ICC were held to have jurisdiction of the matter.

The merits of the abandonment and alternate service issues were not before the District Court and are not before us. Appellees contended simply that neither could be lawfully accomplished without ICC approval under the terms of the Interstate Commerce Act, 49 U.S.C. §§ 1–27 (1964).

Judge Bailey Brown after full hearing issued a memorandum decision holding that the Interstate Commerce Commission did have jurisdiction in relation to both the abandonment issue and the agreement for extension of services issue, and issued injunctions requiring the defendants to cease and desist from the violations found. ICC v. Memphis Union Station Co., 230 F.Supp. 456 (W.D. Tenn.1964)

The appellants contend that they are exempt from ICC jurisdiction in relation to the current problem because of the exception contained in Section 1(22), 41 Stat. 478 (1920), 49 U.S.C. § 1(22) (1964). The exemption reads:

"The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State * *." 41 Stat. 478 (1920), 49 U.S.C. § 1(22) (1964).

Appellants also argue that Congress in 1920 in enacting the ICC legislation, and in 1958 in amending it, gave consideration to the exact problem currently before us and specifically declined to grant the ICC power over union terminals.

---

* Honorable W. Wallace Kent, Chief Judge, U. S. District Court for the Western District of Michigan, sitting by designation.

1. Defendant Union Railway Company is a wholly-owned subsidiary of defendant Missouri Pacific Railroad Company.

Appellees rely upon the broad language of Sections 1(18) and 1(20), and Section 5 (2 and 4) as follows:

"[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate \* \* \*." 41 Stat. 477–478 (1920), as amended, 49 U.S.C. § 1(18) (1964).

"Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest \* \* \*." 41 Stat. 478 (1920), 49 U.S.C. § 1(20) (1964).[2]

"It shall be lawful, with the approval \* \* \* of the Commission \* \* \*

(ii) for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto. \* \* \*" 54 Stat. 905 (1940), 49 U.S.C. § 5(2) (1964).

Section 5(4) makes unlawful such an agreement without Commission approval.

The ICC also relies upon a number of cases where the ICC has assumed jurisdiction, sometimes without contest from the parties involved, in terminal track situations somewhat comparable to that which we have before us. St. Joseph Union Depot Co., 133 I.C.C. 537 (1927); Atchison, Topeka & Santa Fe Railway Co. Operation, 224 I.C.C. 39 (1937); Fort Worth Union Passenger Station Co., 97 I.C.C. 698 (1925); St. Louis, San Francisco & Texas Railway Co. Trackage Rights, 267 I.C.C. 30 (1946).

Finally, the ICC and the District Judge rely upon Mr. Justice Taft's opinion in Railroad Commission of State of California v. Southern Pacific Company, 264 U.S. 331, 44 S.Ct. 376, 68 L.Ed. 713 (1924), which we shall refer to in more detail later.

The Cotton Belt Railroad (St. Louis Southwestern Railway Co.) appears with an entirely separate argument and asks to be dismissed as an appellant. Cotton Belt says that it had nothing to do with the matter, since it had not been operating any trains into the Union Station since 1952.

This appeal then is specifically concerned with problems of statutory interpretation. The detailed facts are not in dispute. They are quoted below from a statement of facts in appellant Southern Railway Company's brief with which all parties express agreement:

"For many years, defendants Missouri Pacific Railroad Company ('MoPac'), the Louisville and Nashville Railroad Company ('L&N'), Southern Railway Company ('Southern') and the Illinois Central Railroad Company ('Illinois Central') have provided rail passenger service in interstate commerce to the city of Memphis, Tennessee. Defendant St. Louis Southwestern Railway Company ('Cotton Belt') rendered similar service to Memphis until it was discontinued in 1952. Defendant Union Railway Company ('Union Railway'), wholly owned Tennessee switching and terminal subsidiary of MoPac, owns the main line tracks used by the MoPac passenger trains to reach the Memphis Union Station.

"In 1909, the N. C. & St. L. Ry. Co. (later merged with L&N) and defendants MoPac, L&N, Southern and Cotton Belt organized the Memphis Union Station Company ('Union Station') for the purpose of constructing and maintaining a union passenger depot for the joint use of the proprietary railroads as tenants. The union station was completed in 1912, at which time the four railroads rerouted their pas-

---

2. Section 1(20) also provides criminal penalties for violation of Section 1(18).

senger trains from their former stations in Memphis to the new union depot. Forty percent of Union Station's stock is owned by the L&N; each of the other three railroads owns 20% of the shares. The expenses of Union Station have been prorated among the proprietary railroads, as tenants, on a user basis.

"Union Station's property is located immediately north of, and adjacent to, the mainline tracks of the L&N, Southern and Union Railway on Broadway. To reach the Union Station tracks, passenger trains backed into the station from the mainline tracks on Broadway; the same trains departed via the same route, the station tracks being 'stub-end' tracks leading to nothing but the station building itself and related facilities.

"Prior to 1925, Union Station classified its station tracks as 'main line' tracks in reports filed with the Commission. In that year, however, the Commission ruled, in Memphis Union Station Co., 97 I.C.C. 418, 429 (1925), that the company 'owns no mainline milage' and characterized Union Station's tracks as 'yard tracks and sidings.' Since that time, Union Station, by order of the I.C.C., consistently has identified its tracks in reports to the Commission as 'Yard tracks.'

"On November 1, 1952, the Cotton Belt discontinued its passenger service to Memphis by authority of the Arkansas Public Service Commission. Thereafter, it ceased to use Union Station. No approval for this withdrawal by Cotton Belt was obtained from the Commission; nor did the Commission ever allege that this action required prior Commission approval.

"The original joint operating agreement between the railroads for the use of Union Station was for 50 years, expiring April 1, 1962. Subsequently, it was agreed by MoPac, L&N and Southern to extend the agreement another two years, to April 1, 1964. Confronted with the economic pinch of declining rail patronage and rising costs of operating Union Station, none of the tenant railroads desired any further extension of the agreement. Upon the expiration date, both MoPac and Southern reactivated their former passenger stations in Memphis, and the L&N reached agreement with the Illinois Central to share the use of the Illinois Central's station 2 blocks west of Union Station.

\*    \*    \*    \*    \*    \*

"The Director of the Commission's Bureau of Finance, in response to letters from employees of Union Station, on February 27, 1964, directed identical letters to MoPac, L&N and Southern inquiring as to their intentions and asking whether any abandonment was contemplated that required Commission approval. Both MoPac and L&N, by written replies, confirmed their intentions to leave Union Station at the expiration of the agreement and expressed their opinion that no Commission approval was required. Southern orally advised the Commission that if the other two railroads terminated operations at Union Station, it would have no alternative but to do likewise.

"On March 16, 1964, the Commission's Director, Bureau of Finance, again addressed letters to the interested railroads stating it was his 'informal opinion that a railroad may not abandon operations over a line of another such carrier without approval under section 1(18), except to the extent it may be exempt as provided in that section or in section 1(22),' and suggested that 'in order to avoid a possible violation of the Interstate Commerce Act' the railroads consider the filing 'of appropriate applications which may be accompanied by motions to dismiss for lack of jurisdiction.' By written replies, dated March 24 and 25, 1964, both L&N and MoPac reiterated their view that the relocation of their Memphis passenger facilities was exempt from the requirement of prior Commission approval under Section 1

(18). No further communication was received from the Commission, and on April 1, 1964, each of the three railroads terminated operations at Union Station and commenced using station facilities at their new locations in Memphis.

"On May 14, 1964, over seven weeks after these changes had been made, the Commission filed a complaint in the United States District Court for the Western District of Tennessee against Union Station, its proprietary railroads and Illinois Central.

"The complaint alleged that on April 1, 1964, Union Station, MoPac, L&N and Southern had abandoned operations at Union Station without having first obtained from the Commission a certificate that the present and future public convenience and necessity permit of such abandonment, as allegedly required by Section 1(18) of the Interstate Commerce Act, 49 U.S.C. 1(18), and that the District Court should issue an injunction, under Section 1(20) of the Act, 49 U.S.C. 1(20), restraining defendants from abandoning or contributing to the abandonment of the use and operation of Union Station's facilities.

"The complaint also alleged that commencing April 1, 1964, defendant L&N had instituted passenger service to and from the Memphis station of Illinois Central without having first obtained Commission approval, as allegedly required by Section 5(2) of the Interstate Commerce Act, 49 U.S.C. 5 (2) and that the District Court should issue an injunction, under Section 5(8) of the Act, 49 U.S.C. 5(8), restraining L&N from using Illinois Central's station and station tracks.

"Both the City of Memphis and the Railway Labor Executives' Association intervened as plaintiffs in support of the Commission's complaint.

"After a hearing on the Commission's motion for preliminary injunction, District Judge Bailey Brown on June 12, 1964, issued a memorandum decision, which was later supplemented by a letter to all parties, July 6, 1964. In his opinion, Judge Brown concluded:

(1) 'that at least some of the tracks at Union Station do constitute a "line of railroad" within the meaning of Sec. 1(18) of the Act and conversely are not "spur" or "switching" tracks within the meaning of Sec. 1(22); and further that the cessation of operations over these tracks constitutes an abandonment and not a mere relocation. Accordingly, Union Station, L&N, Southern and MoPac have abandoned a line of railroad in violation of the provisions of Sec. 1(18).'

(2) 'that some of the tracks at Illinois Central terminal are likewise a "railroad Line" within the meaning of Sec. 5(2) of the Act and conversely are not "spur" or "switching" tracks within the meaning of Sec. 1(18) of the Act; and further that the institution of operations there by L&N constitutes an acquisition of trackage rights and not a mere relocation. Accordingly, L&N has acquired trackage rights over or joint use of a line of railroad in violation of Sec. 5(2) and 5(4) of the Act.'

"After further hearing, the Court entered its final judgment and order, October 14, 1964, amended October 23, 1964, which confirmed the prior findings of the memorandum decision and granted a Commission motion for summary judgment to the extent that Union Station, MoPac, L&N and Southern were enjoined from abandoning a 'line of railroad' at Union Station without approval of the Commission and L&N and Illinois Central were enjoined from operating under a trackage agreement at Illinois Central passenger station unless and until such agreement was authorized by the Commission. These permanent injunctions were stayed pending appeal upon the posting of supersedeas bonds

by defendants Union Station, MoPac, L&N and Southern."

While the positions of the various appellant railroads are not identical, our view of the relevant statutory provisions does not require the specific details which each has added pertaining to its own individual situation, except to the extent set out below in this opinion.

We believe the two principal questions for our decision are these: (1) Was the trackage of the Memphis Union Station which was abandoned by appellants in 1964 a "line of railroad" within the meaning of Section 1(18) so as to require ICC approval prior to abandonment?

(2) Where at least one of the appellants entered into a trackage use agreement with another railroad in order to operate from alternate facilities, did such an agreement require prior ICC approval under Sections 5(2) and 5(4)?

The District Judge who heard this case answered both of these questions Yes.

## THE CLAIM OF EXEMPTION

Appellants rely principally in this appeal upon the contention that since the Memphis Union Station was reached by switches from the main lines of the railroads concerned, and since the station tracks were "stub end" tracks, the exemption from regulation of Sec. 1(22) applies to them. The language of the section exempts "spur, industrial, team, switching, or side tracks located * * wholly within one State. * * * *"

We recognize, of course, that in some sense the Memphis Union Station trackage could be referred to as "spur" or "switching" trackage. It is certainly not trackage on which trains move "through."

■ But clearly it is trackage on which interstate passenger service has both originated and terminated since 1912. No passenger seeking to leave Memphis for another state, or seeking to come to Memphis from another state by any of the railroads operating therefrom during all of that period could do

so without traveling over some of the trackage of the Memphis Union Station. The now abandoned operations were an integral part of uninterrupted transportation of interstate passengers. We do not think that the normal usage of language would include a facility such as the trackage of the Memphis Union Station as "spur" or "switching" tracks. Detroit & Mackinac Railway Co. v. Boyne City, Gaylord & Alpena Railroad Co., 286 F. 540, 546–547 (E.D.Mich.1923).

## ADMINISTRATIVE INTER-PRETATION

The weight of administrative interpretation is plainly in support of the view expressed above. Repeatedly during the history of the operation of the Memphis Union Station the ICC has assumed that it had jurisdiction over operations over its trackage. Rules, Standards and Instructions for Signal Systems—Memphis Union Station Co., 310 I.C.C. 669 (1960); Memphis Union Station Company—Extension of Operating Agreement, Finance Board No. 3, Interstate Commerce Commission, Finance Docket No. 21933, April 25, 1962; Memphis Union Station Company, 97 I.C.C. 418 (1925).

Similar interpretations have been made repeatedly by the ICC pertaining to terminal trackage at other union terminals. St. Joseph Union Depot Co., supra; Atchison, Topeka & Santa Fe Railway Co. Operation, supra; Fort Worth Union Passenger Station Co., supra; St. Louis, San Francisco & Texas Railway Co., Trackage Rights, supra. See also Illinois Central Railroad Co. Construction and Trackage Rights, 307 I.C.C. 493 (1959), modified, 317 I.C.C. 502 (1962); Norfolk & Western Railway Company v. United States, 241 F.Supp. 974 (N.D.Ohio 1965), prob. juris. noted, 382 U.S. 913, 86 S.Ct. 288, 15 L.Ed.2d 230 (1965).

■ While not controlling of our decision, the administrative interpretation is entitled to great weight. Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Review Committee, Venue VII, Commodity Stabilization Service,

United States Department of Agriculture v. Willey, 275 F.2d 264 (C.A. 8, 1960), cert. denied, 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1522 (1960).

## TRACKAGE USE AND NATIONAL CONCERN

■ We have already emphasized the most important fact in the record—that passengers moved in interstate commerce to and from the City of Memphis over the Memphis Union Station tracks in continuous uninterrupted movements from 1912 to 1964. It is, we believe, the use of these tracks as an integral part of railroad systems developed to accommodate interstate commerce which determines that they constitute "a line of railroad" within the meaning of Section 1(18). Transit Commission v. United States, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933).

In this regard the District Judge found that such use was a subject of "national concern." United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936); Texas and Pacific Railway Co. v. Gulf C. & S. F. Railway Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926). The evidence in this record seems to us amply to justify the District Judge's finding in this regard. It certainly cannot be set aside as "clearly erroneous." Rule 52(a) Fed.R. Civ.P.

## LEGISLATIVE HISTORY

With all of this having been said, appellant's most persuasive argument has yet to be dealt with. Appellant Southern's brief seeks to demonstrate that the legislative history of the Interstate Commerce Act shows conclusively that Congress in adopting this legislation debated and rejected inclusion of railroad stations under the regulatory power of the ICC. In this regard appellants rely upon an amendment offered by Congressman McClintic of Oklahoma:

"Provided further, that the Commission is hereby given authority to require a carrier to maintain his present arrangement or to make new arrange-ments relative to the joint use of depots, upon such terms as shall be found by the Commission to be just and reasonable. No carrier shall be allowed to discontinue the use of a depot in connection with another carrier until proper application has been made to the Commission." 58 Cong.Rec. 8578 (1919).

This facet of the legislative history argument is not particularly persuasive in regard to our present case. The issue here does not pertain to the station building or depot. It pertains to railroad trackage to or in such a station. Station buildings or depots might be altered or replaced without material (or any) change in trackage. The rejection of the quoted amendment may not be read as squarely applicable to the instant dispute.

This distinction is not, however, of any help in dealing with the quotation from Congressman Esch of Wisconsin during debate on the bill:

"But neither provision, the building of new lines or the abandonment of old ones, affects spurs or switches or terminal tracks or interurban lines wholly within a State. These we leave to State control, where they already belong." 58 Cong.Rec. 8316 (1919).

■ We recognize that this statement is due appropriate weight in our consideration of legislative intent and that it is inconsistent with the result reached by the District Judge.

Taking into account, however, all of the factors which bear on proper interpretation of this statute, we do not think this aspect of the legislative debate is controlling.

As we have seen, Congress did not employ in the exemption clause words which in normal usage would include the trackage of the Memphis Union Station.

Further, we believe that it is significant that although the words "terminal tracks" were used in the debate, they were not employed in the exemption clause, Sec. 1(22), upon which appellants largely plant their case.

And as Judge Brown notes, this is true, even though the terms "terminal" and "terminal facilities" as classifications separate from "switches" and "spur tracks" were actually employed in another unrelated section of the statute.[3]

Most important of all, in the interpretation of legislative intent is the clearly expressed purpose of Congress to grant authority to the ICC to deal with the construction, extension and abandonment of any lines of railroad employed in interstate commerce. See Sections 1(18) and 1(20). Such a purpose seems to us to express a grant of authority over interstate railroad construction and abandonment as a part of a national scheme and purpose.

It appears to us that this purpose was recognized early in the interpretation of the ICC legislation:

"The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged. Dayton-Goose Creek Railway Co. v. United States, 263 U.S. 456, 478 [44 S.Ct. 169, 68 L. Ed. 388] (1924).

In the Southern Pacific case, Chief Justice Taft discussed union terminal problems as a part of interstate railroad regulation:

"We think, however, that means of control over installation of such new union stations for interstate carriers is given to the Interstate Commerce Commission in amended paragraphs (18 to 21) of § 402. They provide that no interstate carrier shall undertake the extension of its line of railroad or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation over such additional or extended line of railroad unless and until the Commission shall certify that public convenience present or future requires it, *and that no carrier shall abandon all or any portion of its line or the operation of it without a similar certificate of approval.* Such a certificate is, we think, necessary in the construction of a new interstate union station, which involves a substantial and expensive extension of the main tracks or lines of interstate carriers who theretofore have maintained separate terminals." Railroad Commission etc. v. Southern Pacific Co., supra, 264 U.S. at 344, 44 S.Ct. at 378. (Emphasis supplied.)

As Judge Brown pointed out in his excellent memorandum opinion in this case:

"The courts have held that the exceptions contained in Sec. 1(22) should be strictly construed. Piedmont etc. Ry. Co. v. I.C.C., 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115 (1932); Lancaster

---

3. "The term 'railroad' as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad, whether owned or operated under a contract, agreement, or lease, and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein, including all freight depots, yards, and grounds, used or necessary in the transportation or delivery of any such property." 41 Stat. 474 (1920), as amended, 49 U.S.C. § 1(3) (a) (1964).

et al. v. Gulf, etc. Ry. Co., 298 F. 488 (S.D.Tex., 1924); Chicago etc. Ry. Co. v. Northern Pacific Ry. Co., 120 F. Supp. 710 (W.D. Wash., 1954). In the Piedmont case, it is said at page 311 of 286 U.S., at page 545 of 52 S.Ct.:

'The Transportation Act was remedial legislation, and should therefore be given a liberal interpretation; but for the same reason exemptions from its sweep should be narrowed and limited to effect the remedy intended.'" ICC v. Memphis Union Station Co., supra, 230 F.Supp. at 464.

■ Trackage at the Memphis Union Station which had previously been used for continuous railroad passenger service in interstate commerce was a part of several national railroad systems. It was created, as this record clearly shows, at great expense. It is properly termed, as the District Judge held, a subject of national concern. We do not think that Congress intended such facilities to be exempted from regulation.

It is the opinion of this court that the abandonment of railroad passenger service at the Memphis Union Station on or about April 1, 1964, required the abandonment of a "line of railroad" within the meaning of Sec. 1(18) and 1(20) of the Interstate Commerce Act. Clearly under the cited provisions such abandonment could be legally accomplished only by prior approval of the Interstate Commerce Commission.

■ As to the remaining issues in this appeal, we feel that the District Judge likewise reached the right result. Even more specifically than Sections 1(18) and 1(20) prohibit abandonment without ICC approval, Sections 5(2) and (4) appear to us to require prior ICC approval for the trackage right agreement between the defendant Louisville and Nashville Railroad Co. and the Illinois Central Railroad Co. for the use by the former of the latter's trackage and passenger station. We affirm Judge Brown's judgment in this respect on the reasoning of his opinion and the facts as found by him.

■ The last issue which seems to us to merit specific mention is the contention of the Cotton Belt (St. Louis Southwestern Railway Co.) that it should be dismissed as a defendant since in fact it has not operated passenger trains into the Memphis Union Terminal since 1952. Attractive as this contention is, we finally have been forced to conclude that we should affirm Judge Brown's denial of the Cotton Belt's motion to dismiss. The Cotton Belt, as a one-fifth owner of the Memphis Union Station Co., has a present right to run trains into that station employing a line or lines of railroad so to do. Since that right will undoubtedly be affected by the outcome of this litigation, we believe the Cotton Belt is a proper party.

For the reasons set forth herein and in the memorandum decision of the District Judge (which we specifically affirm), we affirm the final judgment entered October 14, 1964, and the order amending same entered October 23, 1964.